STATE of Missouri, Respondent,

v.

Beverly Ann **BALDRIDGE**, Appellant.

Nos. WD 42845, WD 44688.

Missouri Court of Appeals,
Western District.

April 13, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 1, 1993.

Application to Transfer Denied
Aug. 17, 1993.

Anthony C. Cardarella, Asst. Appellate Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Joseph P. Murray, Asst. Atty. Gen., Jefferson City, for respondent.

Before BERREY, P.J., and ULRICH and SMART, JJ.

SMART, Judge.

Appellant Baldridge was convicted of first-degree murder in the death of Pearl Newby, an elderly invalid residing with appellant at the time of her death. She was sentenced to life in prison without parole. Beverly Baldridge appeals her conviction, and also appeals the denial of her 29.15 motion.

Pearl Newby was 84 years old at the time of her death. She had been suffering from heart disease many years, and also suffered from other medical conditions, including kidney deficiency. Because of her condition of chronic congestive heart disease, she had been taking digoxin, a form of digitalis, at least ten years. Digoxin is a medication which increases the ability of the heart to contract, causing the heart to be able to pump more effectively. Digoxin is ordinarily taken daily for maximum therapeutic effect. The dosage must be monitored, due to the fact that if a patient is not excreting sufficient bodily fluids, the digitalis can build up to toxic levels, which may cause cardiac arrest.

Ms. Newby was in the hospital in early 1988 for heart failure and pneumonia. On March 4, 1988, she was discharged from the hospital to the care of Beverly Baldridge, the appellant. Mrs. Baldridge was the neighbor of Ms. Newby, and had provided care and assistance to Ms. Newby in the past. Ms. Newby this time was moved into Mrs. Baldridge's trailer because of the high level of care required, which included everything from feeding her to changing adult diapers.

Ms. Newby died twelve days after she was moved into Mrs. Baldridge's home. Since cardiac arrest is a known result of digitalis toxicity, an autopsy was ordered. Cardiac arrest was determined to be the cause of death. Because the body had already been embalmed by the time the autopsy was ordered, the blood could not be tested for the level of digitalis. However, an analysis was performed of the vitreous humor (the liquid in the eye), which showed that there would have been a high level of digitalis in Ms. Newby's bloodstream at the time of her death. This high level of digitalis was indicative of digitalis poisoning, presumably as a result of an overdose of digoxin. The autopsy did not include an analysis of the kidney sample or the stomach contents because the samples were unsuitable for testing due to the fact that the embalming process had been commenced.

Suspicion was focused on Mrs. Baldridge, who was already suspected of forging Ms. Newby's signature on certain documents, including a will which purported to leave Ms. Newby's entire estate to Mrs. Baldridge. Mrs. Baldridge gave a voluntary statement to the police, in which she stated that she was in control of the medication taken by Ms. Newby, who was unable to take medication on her own. Mrs. Baldridge stated she kept Ms. Newby's medication on a shelf in the hall closet, and that she had provided the medication to Ms. Newby each day, holding the water glass while Ms. Newby drank through a straw.

At trial, a pharmacist testified concerning the digoxin prescriptions written for Ms. Newby. The last refill of the prescription occurred on March 4, 1988, the day she was discharged from the hospital. The prescription refill was 100 pills of .25 mg digoxin. A toxicologist who had conducted tests in connection with the autopsy, Charles Johnson, testified that his analysis of the vitreous humor indicated a digitalis level equal to at least 12.7 nanograms per milliliter. Dr. Johnson indicated that the serum (blood) level of digitalis would ordinarily be expected to be even higher than the vitreous level, particularly during the absorption phase of the drug. The testimony showed that 12.7 nanograms per milliliter was a highly toxic level of digitalis. A digitalis level of 1 to 2 ng/ml is generally considered a therapeutic level for people with heart disease. A level higher than 2 ng/ml quickly becomes toxic, and can cause various adverse conditions, including cardiac arrest.

Dr. James Bridgens, a pathologist asked by the county coroner to perform an autop-

sy, concluded the cause of death was cardiac arrest due to digitalis poisoning. This conclusion was based on the high level of digitalis shown in the vitreous humor. Digitalis poisoning can result from an overdose, and can also be a result of build-up from regular dosages due to dehydration or poor kidney function. The testimony of the medical witnesses at trial suggested that a vitreous digitalis level of 12.7 ng/ml could not be the result of gradual accumulation from a regular dosage because, according to the trial witnesses, the fatal level would have been reached at a level much lower than 12.7 ng/ml.

The prosecution's charge of murder was based upon the high level of digitalis in the deceased's body at the time of her death, and Mrs. Baldridge's motive of greed based upon the efforts of Mrs. Baldridge to forge documents in order to obtain Ms. Newby's estate, which was worth approximately $120,000.00. Defense counsel argued that either Ms. Newby had died from "natural causes" independent of the digoxin, or else she had committed suicide. No evidence was presented at trial in support of the proposition that the digitalis toxicity could be the result of a gradual accumulation rather than an overdose. Mrs. Baldridge was found guilty after a trial, and was sentenced to imprisonment for life without parole.

### Prosecutor's Comments in Closing Arguments

First we take up the issues raised in Mrs. Baldridge's direct appeal. Defendant initially argues on appeal that the verdict must be reversed because the prosecutor's statements in closing argument exceeded the permissible boundaries of legitimate argument because 1) the prosecutor sought to deliberately deceive the jury, 2) the comments suggested special knowledge on behalf of the prosecutor as to Defendant's guilt, and 3) the prosecutor attempted to improperly shift the state's burden of proof to the defense. Defendant contends that the trial court plainly erred in failing to *sua sponte* take any corrective measures, by jury admonishment or declaration of a mistrial, to ensure that Defendant's jury

would not rely on the prosecutor's inappropriate comments. She argues that the error resulted in the denial of her rights to due process and a fair trial as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution.

The State correctly points out that Missouri law generally discourages a court from granting relief on plain error assertions concerning closing argument because "in the absence of objection and request for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *State v. Clemmons*, 753 S.W.2d 901, 907–908 (Mo. banc 1988), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). Nevertheless, we will review Defendant's claim for plain error.

In closing argument, Defendant's attorney hypothesized that either Ms. Newby committed suicide by means of an overdose, or that there was no overdose, and that death was by "natural causes." Defense counsel made the following statements in closing argument:

Something we haven't talked about, something that you should be aware of, another small fact, there was testimony about prescriptions being purchased from Gray's Pharmacy. They purchased three bottles, a hundred pills in a bottle. If it was such a gigantic dose, where did all the extra pills go? If you think about the dates that the prescriptions were ordered, the first one in July, there was another one about three or four months later, and the last one was purchased some time in February. Is there any evidence to indicate that there was only one pill left? No, there wasn't any such evidence.

I submit to you that all the pills that were supposed to be there were there or that you would have heard about it.

As part of the rebuttal argument of the prosecutor, the following argument was made:

The defendant said where did the extra pills go? *I'll tell you where they went. They went right down Mrs. Newby's throat. That is where the extra pills went.* The person who was in control of that medication is his own client. If the evidence was that there was a bunch of pills left, why didn't he bring it on? Why didn't you hear that evidence, that there were way too many pills left, that there couldn't have been any put down her throat? *The pills weren't here. I'll tell you where the pills were. They were in Mrs. Newby.*

(emphasis added).

Defense counsel did not object to this argument. Apparently there were pills found in Ms. Newby's prescription bottle after her death.[1] However, this court does not know the number of pills found, because information as to the precise number of pills was not presented to the post-conviction court and is not part of the record before this court.

 Generally, plain error is not found as to comments made during closing argument. *State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992). Wide latitude is accorded counsel in making closing argument and an abuse of the trial court's discretion will only be found when the argument is plainly unwarranted and has a prejudicial effect on the result reached by the jury. *State v. Willis*, 764 S.W.2d 678, 680 (Mo. App.1988). Furthermore, in responding to a defendant's argument, a prosecutor may make retaliatory remarks, even if the comments would otherwise be considered improper. *State v. Walls*, 744 S.W.2d 791, 798 (Mo. banc 1988), *cert. denied* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988).

 In closing argument the prosecutor had every right to remind the jury that there was no evidence introduced that any pills remained at all, and that the jury should base its decision upon the evidence in the case, especially in light of defense counsel's comments regarding the existence of the pills. Although the prosecutor's comments which asserted that the "extra" pills were in Ms. Newby may have allowed the jury to draw a misleading inference, we have no way of knowing whether the comments were misleading to a material degree because we do not know how many pills of Ms. Newby's remained at the time of her death.[2] Moreover, the record does not show that the trial court had any knowledge as to how many pills remained at the time of Ms. Newby's death. The trial court, therefore, would have been similarly incapable of determining any problem with the prosecution's argument. We are unable to find that plain error resulted from the prosecutor's comments. The trial court did not err in failing to *sua sponte* declare a mistrial or engage in other corrective measures. This point is denied.

### Newly Discovered Evidence

In her next point on appeal, Defendant claims that new evidence was discovered after trial that casts serious doubts upon the accuracy of State's forensic test results. Defendant suggests that after trial the defense learned that the State's testing procedures failed to account for the possible presence of Digitalis-like Immunoreactive Substances ("DLIS"), a scientific phenomenon known to cause false test results. Defendant relies on the testimony of Vernon Green, Ph.D., a toxicologist, presented at her post-conviction hearing. Dr. Green's testimony indicated that patients with decreased kidney output can cause production of a protein that reacts just like digitalis in testing, so as to exhibit abnormally high (false) digitalis levels in test results. Dr. Green's testimony suggests that the vitre-

---

**1.** Neither side introduced any evidence at trial as to any of the deceased's supply of medication remaining at the time of her death. At the post-conviction hearing, trial defense counsel acknowledged that he did not offer evidence as to the pills remaining because he did not think it would be particularly helpful. No one asked him how many pills, in fact, were left.

**2.** An intentionally and materially misleading argument by the prosecution may be grounds for reversal, even if reviewed only as plain error. *See State v. Thompson*, 396 S.W.2d 697 (Mo. banc 1965).

ous test could be in error as much as 2 ng/ml. This phenomenon (DLIS) can occur even in patients who have never taken digoxin. Defendant claims that such omission denied Defendant her rights to due process and a fair trial as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution.[3]

■ Defendant raised this same point to this court on December 9, 1991, in her "Motion for Remand to Trial Court to Enable Appellant to Move for a New Trial Based on Newly Discovered Evidence." This court denied Defendant's motion on December 18, 1991. In appellant's third point she presents the identical argument that she presented in her earlier motion. The Eastern District of this court was recently faced with a similar situation in *State v. Rogers*, 820 S.W.2d 567, 570 (Mo. App.1991), where the court explained its holding as follows:

> On April 4, 1991, this court issued an order denying defendant's motion to supplement record on appeal and remand for filing of an amended motion for new trial and a hearing based on newly discovered evidence. If the defendant disagreed with this decision the proper method to challenge it would have been to file a petition for an extraordinary writ with the Missouri Supreme Court at that time, or to wait and file appropriate post-opinion motions pursuant to Rule 30.26 and Rule 83.03.

■ *Id.* Defendant here presents an issue that has already been decided once by this Court. The issue will not be examined a second time. Furthermore, Defendant's point fails to state "briefly and concisely *what actions or rulings of the court* are sought to be reviewed and wherein and why they are claimed to be erroneous." Rule 30.06(d) (emphasis added). *See State v. Childress*, 805 S.W.2d 729, 730 (Mo.App. 1991). In the instant case, Defendant has failed to allege trial court error. More-

over, a new trial will not be granted based on newly discovered evidence where the evidence in question was reasonably available at the time of the first trial. *State v. Williams*, 652 S.W.2d 102, 114 (Mo. banc 1983). Here, the evidence concerning DLIS could have been discovered at the time of the first trial through the exercise of due diligence. This point is denied.

### *Sufficiency of the Evidence*

Defendant contends that the trial court erred in denying her motion for judgment of acquittal at the close of all the evidence because the evidence was insufficient as a matter of law to sustain a conviction of guilty beyond a reasonable doubt in that 1) the evidence presented remains inconsistent with the State's hypothesis of guilt and 2) the State's circumstantial evidence of guilt remains consistent with an equally reasonable hypothesis of Defendant's innocence. As a result, Defendant argues that she was denied her right to due process as guaranteed by the fifth and fourteenth amendments to the United States Constitution and Article I, § 10 of the Missouri Constitution.

■ In reviewing a sufficiency of the evidence claim, this court must consider the evidence and all reasonable inferences drawn from it in the light most favorable to the State and all contrary evidence must be disregarded. *State v. Franco*, 544 S.W.2d 533, 534 (Mo. banc 1976), *cert. denied*, 431 U.S. 957, 97 S.Ct. 2682, 53 L.Ed.2d 275 (1977). Furthermore, when the State's evidence is circumstantial, Missouri law requires that:

> [T]he facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of his innocence. In such cases, the evidence need not be absolutely conclusive of guilt, nor must the evidence demonstrate the impossibility of innocence.

---

3. The test for the level of digitalis in the vitreous humor apparently cannot be repeated due to the fact that the sample has been destroyed by bacteria as a result of inadvertent failure to keep the sample refrigerated.

**250**

*State v. Livingston*, 801 S.W.2d 344, 347 (Mo. banc 1990).

Defendant's primary complaint in this point is that the State's evidence is not inconsistent with the "reasonable" hypothesis of Defendant's innocence. One hypothesis of innocence is that the cause of the victim's death could have been an accidental toxicity resulting from gradual accumulation of digoxin. While there was evidence of this possibility adduced in the post-conviction hearing, no such evidence was presented at trial. The pathologist who performed the autopsy on the victim and testified as to the victim's cause of death specifically stated that in his opinion the toxic level of digoxin found in Ms. Newby's system could not have been the result of gradual accumulation from her regular dosage. Defendant failed to present any evidence to the contrary. Another hypothesis of innocence, the theory that the deceased committed suicide, has no evidentiary support whatever and is contradicted by the great weight of evidence at trial. The same is true of the theory that the deceased may have died from natural causes. Viewing the evidence in the light most favorable to the State and ignoring all contrary evidence, the State's evidence excludes any reasonable hypothesis of innocence relied upon by Defendant.

The circumstantial evidence presented by the State in this case was sufficient to support the jury's guilty verdict. In dealing with Defendant's general insufficiency of the evidence claim, we present the facts adduced at trial forming the basis of the State's circumstantial evidence case. The state presented eleven health care workers and neighbors who had witnessed Ms. Newby's physical condition during her stay at Defendant's home. The testimony of all of these witnesses was essentially the same, each stating that Ms. Newby was bedridden, could not move without assistance, could not drink or eat without assistance, spoke very little, generally answering questions with "yes" or "no" responses, and appeared to be in continual pain.

The evidence showed that in November, 1987, Defendant began making attempts to have her name added to Ms. Newby's bank accounts. Defendant made several unsuccessful attempts to add herself to the accounts, including forging Ms. Newby's name. However, due to the efforts of an astute bank officer, her attempts ended in failure. The testimony of the bank officer indicated that Ms. Newby did not want Defendant added to her accounts.

The evidence also showed that Defendant Baldridge contacted an attorney in March, 1988, to prepare a power of attorney which would place Defendant in control of Ms. Newby's business affairs. The attorney, Roger Driskill, prepared the power of attorney without ever consulting with Ms. Newby as to her wishes. The document was given to Defendant so that Defendant could obtain Ms. Newby's signature. Testimony showed that Ms. Newby was falling asleep during the signing of the document but finally signed her name with the physical help of Defendant and the notary. One of the witnesses, a neighbor of Defendant, testified that Ms. Newby did not know who she was or where she was during the signing. Defendant then attempted once again to gain access to Ms. Newby's accounts by presenting the power of attorney to Boatmen's Bank. However, the bank rejected the document for unsatisfactory signatures. Boatmen's next received sight drafts signed by Defendant as power of attorney for Ms. Newby payable to American Bank which sought to close out all of Ms. Newby's bank accounts. The bank refused to honor the drafts.

The evidence presented at trial also disclosed Defendant's extensive attempts to get a will executed in Ms. Newby's name before her death. Defendant contacted the same attorney about drafting a will for Ms. Newby claiming that Ms. Newby desired to leave everything to her in return for the care Defendant had given her. Defendant was referred to another attorney, William R. Burkiness, who, after visiting Ms. Newby, determined she did not have the requisite testamentary capacity to execute a will. Defendant finally found another attorney, Lester Adams, willing to draft a will for Ms. Newby without consulting Ms.

Newby. Mrs. Baldridge then attempted to get the will signed. Two friends of Defendant witnessed the will although neither of them saw Ms. Newby sign it. One witness said he signed the will with no other signatures on the document. The second witness signed the will after she knew Ms. Newby had already died that same day.

The evidence also shows that a social worker for the Division of Aging tried to investigate the conditions at Defendant's home after receiving expressions of concern about Ms. Newby, but was prevented from visiting Ms. Newby by Defendant. Testimony indicated that Defendant was afraid the social worker would prevent the execution of the will if she saw the condition of Ms. Newby. The social worker finally gained entry into Defendant's home by obtaining an entry warrant. After the visit she contacted several people about the concerns she had for Ms. Newby's well-being.

The evidence reveals that on the day of Ms. Newby's death, while the paramedics were still trying to revive Ms. Newby, Defendant made phone calls to different people informing them that Ms. Newby had died. Defendant and her neighbor went into Ms. Newby's house and took various items. The evidence further revealed that prior to Ms. Newby's death, Defendant obtained access into Ms. Newby's safe deposit box finding various items of jewelry and a will which left her estate to her brother (by then deceased). Defendant took a diamond ring and diamond earrings from the safety deposit box.

When the police sought to question Defendant after Ms. Newby's death, Defendant, while represented by counsel, gave police a voluntary statement proclaiming her innocence in hopes of avoiding formal charges. Defendant informed police that she was the only one in charge of giving Ms. Newby her medication, stating that Ms. Newby was unable to take it on her own because of her very feeble condition. She further stated that the medicine was kept on the top shelf of a hall closet. She acknowledged she gave Ms. Newby her medication on March 16, the day of her death.

The circumstantial evidence presented in this case was consistent with the guilt of Defendant in that it showed a motive on the part of Defendant for poisoning Ms. Newby. The implication was that Mrs. Baldridge had brought Ms. Newby into her home not to care for her, but to make it easier to obtain her assets. The medical and toxicological evidence at trial indicated that an overdose had been administered to Ms. Newby, an overdose which, the evidence indicated, Ms. Newby was incapable of administering to herself. The scientific evidence showing an overdose occurred was critical to the state's case. The jury clearly concluded that, because of the evidence of the overdose, and because of the evidence of Defendant's greed, Mrs. Baldridge elected not to wait for death to occur naturally. The uncontradicted evidence of the overdose, therefore, was inconsistent with any reasonable theory of Defendant's innocence presented at trial. This point is denied.

*Failure to Disclose Medical Treatise*

Defendant's trial counsel requested disclosure from the State of any material or information within the possession of the State which tended to negate the guilt of Defendant. Defendant alleges that the State failed to disclose a medical treatise purportedly within its files which would have created a reasonable doubt as to whether the cause of death was criminal in nature. Defendant argues that the State's omission acted to deny Defendant her rights to due process and a fair trial as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution.

We conclude that Defendant's Point V is not properly before this court. We once again direct Defendant to Rule 30.06(d), which requires Defendant to allege trial court error in her points on appeal. Defendant's contention fails to allege trial court error. Additionally, Defendant never raised this claim of error at the

trial court level and failed to include such a claim in her motion for new trial as required to preserve the point for appellate review. *State v. Rowling,* 687 S.W.2d 246, 247–48 (Mo.App.1985). Furthermore, nothing in the record supports Defendant's contention, making it impossible to review this point for plain error. Accordingly, we hold that appellant has failed to preserve this point for appellant review. Point V is denied.

### Denial of Counsel During Overnight Recess

▮ Defendant argues that she was denied her right to assistance of counsel when the trial court prohibited her from consulting with her attorney during an overnight recess. After Defendant testified on direct examination, the following exchange transpired concerning Defendant's cross-examination:

(Proceedings held at bench.)

THE COURT: What do you propose:

[prosecutor]: I think we have to finish in the morning because I am going to be awhile, and I think everybody is tired. I will take at least a half an hour.

THE COURT: If we took a break, we could go until later.

[prosecutor]: Judge, I am going to be a while. It is an awful important part of the case, and we have worked a long time today. I feel like we should wait and finish off first thing in the morning.

THE COURT: That means she can't talk to you now.

[defense counsel]: That's fine.

THE COURT: It will be just like I told Driskill. Is that what you want to do?

[prosecutor]: That's fine.

THE COURT: Is that what you want to do?

[defense counsel]: Sure.

The trial judge then addressed Defendant, instructing her that she would not be able to talk to her attorney overnight, in response to which she stated, "Okay."

Defendant argues that the trial court's action in denying her contact with counsel for the sixteen hour overnight recess violated the principles set forth in the United States Supreme Court's decision of *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). The Court in *Geders* held that a trial court's order directing a defendant not to consult with his or her attorney during a regular overnight recess deprived the Defendant of the constitutionally protected right to assistance of counsel in violation of the sixth amendment to the United States Constitution. *Id.* Defendant properly cites the holding contained in *Geders,* but that case is distinguishable from the instant case. In *Geders,* the Defendant's counsel forcefully resisted the trial court's action of prohibiting contact with his client, making several objections to the ruling. The trial court overruled the objections, disregarding counsel's evident desire to consult with his client during the recess. *Id.* at 83 n. 1, 96 S.Ct. 1333 n. 1. Thus, in *Geders* there was an indication that absent the court's instruction, Defendant would have met with his counsel.

In the instant case, counsel failed to make any objection to the denial of contact, and in fact he orally acceded to the trial court's action. Defendant has failed to present any evidence which demonstrates that she would have met with counsel absent the ruling. Defendant correctly points out that she is not required to demonstrate prejudice to prevail on this point. *See Perry v. Leeke,* 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). However, she is required to demonstrate that she was deprived her right to consult with her attorney, which she has failed to do in this case. *See Bailey v. Redman,* 657 F.2d 21, 24 (3d Cir.1981), *cert. denied,* 454 U.S. 1153, 102 S.Ct. 1024, 71 L.Ed.2d 310 (1982) (court found no deprivation of right to counsel where Defendant was barred from discussing ongoing testimony with anyone overnight because no objection was made and there was no showing that Defendant would have conferred with counsel but for the order). We conclude Defendant has waived appellate review of this point. Point VI is denied.

### Opening Statements

The court reporter's notes for the opening statements in Defendant's trial were irreparably damaged by rain as a result of water leaking through the courthouse roof and onto the court reporter's desk. Defendant suggests that in the absence of a complete transcript, she has been deprived meaningful appellate review and is constructively denied her rights to due process, to a full and fair appellate review and to the effective assistance of counsel on appeal as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution, Article I, §§ 10 and 18(a) of the Missouri Constitution, and § 547.070, RSMo 1986.

Defendant claims for the first time in her appellate brief that the inadvertent destruction of the court reporter's notes of opening statements denies her a full and complete transcript on appeal. Once again, Defendant's point leaves nothing for this court to review. Defendant's Point VII does not set forth any trial court error necessary for appellate review in violation of Rule 30.06(d). *See Childress,* 805 S.W.2d at 730. Defendant was required to follow a specific procedure governing the discovery of defects or omissions in the record. The procedure a defendant must follow in such circumstances was set forth by the Missouri Supreme Court in *State v. Borden,* as follows:

> It is the responsibility of the appellant to cause a transcript of proceedings to be prepared and filed with the clerk of the appropriate appellate court. Rule 81.-12(a), applicable per Rule 28.18, 1979 Rules, now Rule 30.04(c) and (d). Such duty is not discharged by merely transmitting whatever the court reporter prepares. If material omissions occurred it was incumbent upon the defendant-appellant to attempt to correct the record by stipulation or by motion to the appropriate appellate court. Rule 81.12(c) (Mo. Rules of Court 1979) amended, Rule 81.-12(e) (Mo.Rules of Court 1980). Reversal and retrial will not be required unless the appellant exercises due diligence to supply the omission or correct the defect and

establishes prejudice as a result of inability to present a complete record.

605 S.W.2d 88, 91–92 (Mo. banc 1980) (where the court held that Defendant had not followed the proper procedure nor shown any prejudice in claiming that 50 missing pages of transcript resulting from machine malfunction denied him a full appeal).

Defendant originally requested that the trial proceedings be transcribed, failing to include opening statements in her request. The record is not clear as to when this request was made. The trial court entered its judgment and sentenced Defendant on December 13, 1989. Approximately five months later, on May 17, 1991, Defendant made motion to the trial court requesting that the opening statements, closing arguments and voir dire portions of the trial be transcribed. It was after this request that Defendant was informed of the water leakage problem. Had Defendant originally requested the transcription of the entire record, she may have avoided this problem. In any event, this case is very similar to *Borden* in that Defendant Baldridge has failed to meet the requirements set forth above and has shown no attempt on her part to obtain by stipulation or motion the substance of the missing material. Additionally, Defendant has failed to support her conclusory assertion that the omissions were prejudicial to her appeal. This point is denied.

### Jury Selection

Defendant's eighth and ninth points will be addressed together due to their similarity. Defendant argues in her eighth and ninth points that the trial court clearly abused its discretion in refusing to select Defendant's prospective jurors according to the newly enacted statutory provisions of §§ 494.400 to 494.505, RSMo Supp.1989. Specifically, Defendant argues that the trial court erred because 1) the methods employed to excuse qualified jurors from service failed to substantially comply with the requirements of § 494.430 that such excusal be within the exclusive judgment of the court, and 2) the methods employed to sum-

mon a panel of jurors for Defendant's trial failed to substantially comply with the requirement of § 494.420.2 that such be "randomly selected." Defendant argues that the trial court's error in this regard denied Defendant of her rights to due process, to a trial by an impartial jury and to a fair cross section of citizens as guaranteed by the fifth, sixth, and fourteenth amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution.

Essentially, Defendant argues that Defendant was prejudiced because the trial judge did not use the newly enacted statutes governing jury selection during the impaneling of Defendant's jury. However, Defendant does not argue that the jury selection violated the prior statutes relating to jury selection. Therefore, the only issue is whether the new statutes were applicable to the selection of this jury panel.

■ The jury panel was originally selected on August 14, 1989. Subsequently, Chapter 494, governing jury selection, became effective on August 28, 1989. Several months later, on November 13, 1989, Defendant's trial commenced. Before the trial commenced, Defendant moved to quash the jury panel and to order a new jury panel selected pursuant to the provisions of §§ 494.400 *et seq.*[4] The trial court denied the motion. Since the jury panel *selection* process commenced prior to the time the new statutes became effective law, we hold that the prior jury selection statutes, §§ 494.010 to 494.340, RSMo 1986, governed the panel selection process for this case, even though the trial occurred after the effective date of the new statutes. There is nothing in the new statutes to indicate that a trial cannot be conducted after the effective date of the statutes where the jury was selected pursuant to earlier statutes. Accordingly, the trial court did not err in overruling Defendant's motion to quash the jury selection.

■ The jury selection procedures utilized in this case also complied with both past and present jury selection statutes. The evidence presented in the trial court shows that the procedure used for the selection of the jury was random. The evidence also shows that the excusal of jurors was in the sole judgment of the trial court. Additionally, Defendant has failed to show that the jury that heard her case was not fair and unbiased. Thus, these points are denied.

### Peremptory Challenges

■ Two other points of Defendant's appeal will be addressed together due to their similarity. In one point Defendant argues that the trial court abused its discretion in denying defense counsel's request to exercise nine peremptory challenges as provided by § 494.480.2(1), RSMo Supp.1989. Defendant contends that § 494.480.2(1) entitles a criminal defendant to nine peremptory challenges "if the offense charged is punishable by death." Similarly, in another point, Defendant argues that the trial court abused its discretion in denying defense counsel's request that the jury not be permitted to separate at any adjournment or recess during the trial and jury deliberations in accordance with § 494.495, RSMo Supp.1989. Again, Defendant correctly contends that this section prohibits separation of the jury in death penalty cases. Defendant argues that the trial court's action denied Defendant her rights to due process and to trial by an impartial jury as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, §§ 18(a) and 22(a) of the Missouri Constitution.

Both of the statutes relied upon by Defendant provide guidelines for death penalty cases. Section 494.480.2(1) provides that "[i]f the offense charged is punishable by death, the state shall have the right to challenge nine [venirepersons] and the De-

---

**4.** Defendant presented this same argument in her motion for post-conviction relief. At the hearing, she presented four witnesses to testify about the jury selection process. We affirm the hearing court's ruling that the points were not properly before the hearing court in a Rule 29.15 motion and therefore, we disregard all evidence adduced at the hearing regarding jury selection process.

fendant nine." Section 494.495 provides that the jury should not be allowed to separate in capital cases. Neither of these specific guidelines apply to the instant case because here the State waived the death penalty before trial, and therefore, this is not a "capital case" nor a case dealing with an offense "punishable by death." *State v. Morgan*, 453 S.W.2d 932, 933 (Mo.1970). Accordingly, the trial court did not err in failing to apply the above guidelines to this case. These points are denied.

### Trial Court's Comments to Jury

Defendant argues that the trial court made certain comments to the jury which were prejudicial. Defendant contends that the trial court plainly erred in commenting to the jury that "[the transcript] is for the Court of Appeals should the matter be appealed," in response to their question concerning whether the transcript of testimony would be available to them during their deliberations. Defense counsel made no objection to the trial court's comments and raised no claim of error regarding the comments in the motion for new trial. Defendant suggests that by bringing the matter of appellate review to the jury's attention, the trial court clearly implied that a verdict of guilty was both proper and expected, and invited the jury to abdicate their responsibility as fact finders. As a result of this alleged plain error, Defendant contends that she was denied her rights to due process and to trial by an impartial jury as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, §§ 18(a) and 22(a) of the Missouri Constitution.

 In order to preserve a point of error for appellate review concerning statements made by a trial court during the course of trial, a defendant must make an objection at trial and include the same objection in the motion for new trial. *See State v. White*, 813 S.W.2d 862, 865 (Mo. banc 1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1193, 117 L.Ed.2d 434 (1992). Missouri appellate courts have held that a defendant's failure to object to comments of the trial court at the first opportunity con-

stitutes a waiver of that claimed error and permits only plain error review of the comments. *See State v. Harvey*, 625 S.W.2d 198 (Mo.App.1981); *Dorsey v. Robinson*, 600 S.W.2d 59 (Mo.App.1980); *State v. Ward*, 588 S.W.2d 728 (Mo.App.1979). Thus, Defendant has not preserved this claim of error for appellate review.

 Plain error review requires the Defendant to show that the alleged error affected substantial trial rights and amounted to manifest injustice. *State v. Bearden*, 748 S.W.2d 753, 756 (Mo.App. 1988). The trial court's comments in this case consisted of a brief and innocuous statement of the purpose of the transcript in the judicial process. The trial court's fleeting mention of the existence of an appellate court and the role of a transcript on appeal, taken in the context of the entire trial, did not substantially affect Defendant's trial rights nor amount to manifest injustice. Thus the trial court's comments did not constitute plain error. *See White*, 813 S.W.2d at 865; *State v. Walker*, 654 S.W.2d 129, 131 (Mo.App.1983); *State v. Babbitt*, 639 S.W.2d 196 (Mo.App.1982); *State v. Green*, 613 S.W.2d 182, 183 (Mo. App.1981); *Harvey*, 625 S.W.2d at 200. Point XIII is denied.

### Reasonable Doubt Instruction

 Defendant's last point on her direct appeal is that the trial court plainly erred in submitting Instruction No. 4 to the jury, defining reasonable doubt, patterned after MAI–CR3d 302.04 because Defendant was denied her right to due process, as guaranteed by the fifth and fourteenth amendments to the United States Constitution and Article I, § 10 of the Missouri Constitution. Defendant argues that the language "firmly convinced" suggests a higher degree of doubt than is constitutionally required for acquittal.

In *State v. Antwine*, 743 S.W.2d 51, 62–63 (Mo. banc 1987), *cert. denied*, 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), the Missouri Supreme Court approved the "firmly convinced" language found in MAI–CR3d 302.04, stating:

The "firmly convinced" language contained in the MAI definition is not new. It is substantially the same as that found in the federal instructions, and has been employed in federal and state courts alike. It is intended to assist lay jurors in their understanding of the legal phrase "beyond a reasonable doubt." The instruction achieves that purpose; in our view, "firmly convinced" is essentially synonymous with "beyond a reasonable doubt."

(footnotes omitted); *see also State v. Barnard*, 820 S.W.2d 674 (Mo.App.1991). Furthermore, MAI–CR3d 302.04 is a mandatory patterned instruction adopted by the Missouri Supreme Court, which this court lacks the authority to declare erroneous. *State v. Crawley*, 814 S.W.2d 8 (Mo.App. 1991). Therefore, we hold that the trial court did not err in submitting the reasonable doubt instruction to the jury.

### Ineffective Assistance of Counsel

Defendant Baldridge raises two claims of ineffective assistance of counsel in her appellate brief. She claims that the motion court clearly erred in denying her motion for post-conviction relief because she was denied her right to effective assistance of counsel as guaranteed by the sixth and fourteenth amendments to the United States Constitution and Article I, § 18(a) of the Missouri Constitution. Defendant claims she was denied effective assistance of counsel in that: 1) pretrial counsel failed to advise Defendant not to give a pretrial statement or to at least inform her of the consequences of giving a statement; and 2) trial counsel failed to consult an expert to aid in preparation and presentation of Defendant's defense.

Appellate review of the denial of a Rule 29.15 motion is confined to the issue of whether the findings of fact and conclusions of law of the motion court are clearly erroneous. *State v. Anderson*, 785 S.W.2d 596, 600 (Mo.App.1990). The motion court's determination is clearly erroneous only if after reviewing the entire record, the appellate court has a definite and firm impression that a mistake has been made. *Id.*

To establish ineffective assistance of counsel, Defendant must satisfy the *Strickland* two-prong test, showing (1) counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under substantially similar circumstances, and (2) that Defendant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Review begins with the presumption that counsel is competent and movant has the "heavy burden" of proving counsel's ineffectiveness by a preponderance of the evidence. *Amrine v. State*, 785 S.W.2d 531, 534 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 181 (1990). Finally, appellant must show that it is probable that a different outcome would have resulted but for counsel's errors in order to show that he was prejudiced by such errors. *Sanders v. State*, 738 S.W.2d 856, 860–61 (Mo. banc 1987).

■ Ineffective assistance of counsel claims relating to "trial strategy" generally do not provide a basis for post-conviction relief. *Rainwater v. State*, 770 S.W.2d 368, 370 (Mo.App.1989). Counsel is vested with wide latitude in defending his client and should use his best judgment in matters regarding trial strategy. *Stuckey v. State*, 756 S.W.2d 587, 593 (Mo.App.1988). Courts reviewing such claims should refrain from employing hindsight when reviewing counsel's conduct at trial. *State v. Lewis*, 785 S.W.2d 656, 660 (Mo.App.1990).

### Defendant's Statement to Police

■ Defendant argues that the motion court should have found that pre-trial counsel, who allowed Mrs. Baldridge to give a statement to police, was ineffective because counsel failed to "fully and adequately apprise Defendant that her otherwise innocuous statements to the investigating authorities could become inculpatory in nature" and in failing to offer any "opposition, resistance or objection" to Defendant making a statement to police. Defendant was prohibited from raising this claim of error before the hearing court because it

was deemed untimely. In ruling on Defendant's attempt to amend her petition, the hearing court stated:

> This motion was filed eight months after counsel was appointed to represent movant. Counsel had only 60 days to amend movant's *pro se* petition. The time limits of Rule 29.15 are valid and mandatory. Consequently, these claims were waived when movant failed to include them in her amended motion for post-conviction relief.

(citations omitted). Missouri law provides that neither a motion court nor an appellate court can consider a claim not timely presented in the Rule 29.15 motion. *State v. Twenter*, 818 S.W.2d 628, 641 (Mo. banc 1991). Accordingly, the hearing court did not err in declining to consider Defendant's claim. Point XI is denied.

### Counsel's Failure to Consult Expert

■ Mrs. Baldridge also contends that her trial counsel was ineffective due to his failure to either consult or take readily available steps to retain a pathologist or toxicologist to aid in preparation and presentation of her defense. When a defendant alleges that his or her trial counsel is ineffective for failing to call witnesses at trial, Defendant is required to show the existence of such witnesses at the time of trial, that they could be located through reasonable investigation, and that the witnesses' testimony would have benefitted Defendant's theories of defense. *State v. Davis*, 814 S.W.2d 593, 603–604 (Mo. banc 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 812 (1992). This test is tempered by the following observation from *Strickland:*

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make

reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment. 466 U.S. at 690–91, 104 S.Ct. at 2066.

■ At the post-conviction relief hearing, Defendant's trial counsel testified that he spoke to a physician or two and to a couple of cardiac nurses, and believed based on his brief discussions with them that any medical evidence he could present would only be cumulative of the state's evidence. He did not identify any medical consultant he talked with. He talked only with people from the field of cardiology. He did not arrange for anyone to review medical records. He did not depose any of the state's expert witnesses because "the Defendant did not have the money to do that." There is no indication that he talked with Ms. Newby's personal physician concerning the condition of her health and factors which might have contributed to excessive toxicity.[5] It is clear that his conversations with medical personnel were very brief and very general. When asked why he did not feel an expert witness was necessary, he said he did not "have any reason to question the toxicity level." He felt he did not need an expert because "it would have been cumulative."

At the post-conviction hearing, Defendant's post-conviction counsel presented the testimony of Vernon Green, Ph.D., a professional consultant in the fields of pharmacology and toxicology. Dr. Green was formerly Chief of Toxicology at Children's Mercy Hospital. Much of Dr. Green's testimony focused upon the possibility of digitalis toxicity occurring as a result of gradual accumulation of digoxin from her regular dosage. He noted that the notes compiled by the visiting nurses (who visited Ms. Newby at Mrs. Baldridge's home after Ms. Newby's release

---

5. The medical records show that Ms. Newby was previously hospitalized on one occasion for digitalis toxicity, which apparently was a result of accumulation due to kidney malfunction and dehydration.

from the hospital) showed "very obviously" that Ms. Newby was having kidney dysfunction. He said that if the digoxin is not eliminated by the kidneys, and the dose is continued, the digoxin would simply accumulate. When asked whether he had an opinion "within a reasonable degree of scientific certainty" whether Pearl Newby's poisoning could have possibly been a result of a gradual accumulation, he responded that he saw "no reason why it wasn't just a normal therapeutic dose she was getting daily because of the fact she was not getting rid of any of it." [6] In other words, he was suggesting that there was no large overdose, but that instead it was a gradual build-up of toxicity from her regular dosage which killed Ms. Newby.

Dr. Green also testified that in any individual who is retaining body fluids due to decreased kidney output, the kidney begins "kicking out a low protein that reacts in the digitalis assay just like digitalis." He said this protein is called DLIS, which stands for Digitalis-like Immune Reactive Substance. He testified that the presence of DLIS can cause the test for digitalis to indicate a false reading, since the actual level of digitalis would not be as high as the laboratory reading would suggest. He said it is possible to eliminate the DLIS factor by chilling the test solution to 4 centigrade. He testified that if DLIS is in the blood, it will also be present in the vitreous humor. Dr. Green said he had seen instances of blood digitalis readings even higher than 12.7 ng/ml in cases of suicides involving massive doses. With regard to DLIS, he testified that this substance would affect the digitalis reading a relatively small amount—not more than 2 ng/ml. When Dr. Green was asked how long it would take to build up the digitalis level to 12.7, he replied that he would need to know what the level was at the starting point, and how much digoxin was being

ingested, and how much was being excreted. If a person were not excreting any digitalis, and were taking .25 mg per day (Ms. Newby's dose), it would not take more than 8 or 9 days to build up to a level of 12.7 ng/ml, according to Dr. Green. Dr. Green testified that if Ms. Newby had received a massive overdose at one time, the records would not have shown the "gradual symptoms building" as the records seemed to show. He stated that the symptoms "would all have occurred at once." He added that in the case of a massive overdose, symptoms of nausea, vomiting, gastrointestinal distress, and dizziness occur almost immediately as soon as some of it is absorbed.

Mrs. Baldridge also presented testimony from Dr. Charles Johnson, chief chemist with the Toxicology Lab at the University of Missouri Columbia, who had testified for the state in the trial of Mrs. Baldridge. Dr. Johnson acknowledged that in his trial testimony he had not reviewed any medical records of Ms. Newby, and had not been informed of any kidney problem she may have had. Dr. Johnson stated that in his testimony concerning the digitalis level of the vitreous humor in this case, he did not take into account the presence of DLIS because he considered it doubtful that DLIS would be present in the vitreous humor. He stated he could not say with "100 percent confidence" that DLIS could not be a factor in the vitreous humor. Dr. Johnson opined that if DLIS were able to get into the vitreous humor, the interference would be less than 2 ng/ml.

In response to Defendant's claims at her Rule 29.15 hearing, the hearing court found:

Trial counsel's decision not to secure expert medical testimony was reasonable in light of the defense's theory of the case. The defense presented was not

---

6. The nursing records reveal that Ms. Newby did have somewhat regular urinary output between the time she left the hospital and the time of her death. Apparently her kidney dysfunction did not keep her from urinating, but did somehow cause her to fail to excrete digoxin, if Dr. Green's testimony can be understood. On the other hand, if Dr. Green failed to consider her urinary output, then his conclusions must be considered as being without scientific merit. Since the case is being remanded, it is hoped that it may be clarified on remand whether Dr. Green considered the deceased's urinary output, and that an explanation can be obtained for this possible contradiction.

designed to contest the cause of death, but rather, was designed to challenge how the overdose was administered. The defense theorized that the victim committed suicide. Although the jury did not adopt this theory, it was a reasonable approach to the case by trial counsel. Counsel thoroughly investigated the victim's medical condition and the cause of death by consulting medical experts. Counsel testified that it was his belief that a medical expert's testimony would only have been cumulative of the State's evidence. This court finds that logic to be objectively reasonable. Decisions related to trial strategy are "virtually unchallengeable." Consequently, trial counsel breached no duty to movant in this respect.

(citations omitted).

The issue before the trial court was whether defense counsel failed to consult expert witnesses who would have been able to provide information and insight useful in the defense of the case. The post-conviction court analyzed the reasonableness of counsel's actions "in the light of the defense's theory of the case." The trial court concluded that, in view of the strategy decision to rely heavily on the theory that the deceased committed suicide, the decision not to present expert testimony was reasonable. However, the court should have carefully analyzed the thoroughness of the investigation conducted by counsel before counsel made the strategy decision. *Strickland* requires that before a major strategy decision is made, there must be a reasonable consideration of matters pertinent to the decision. Strategy decisions made after consideration of matters relevant to the investigation are "virtually unchallengeable." But strategy decisions made in the absence of investigation may be held to be ineffective assistance of counsel. 466 U.S. at 691, 104 S.Ct. at 2066; *see also Moore v. State*, 827 S.W.2d 213 (Mo. banc 1992). The defense in this case was not limited to arguing that the death was a suicide. The defense could also have argued that, alternatively, there was no overdose at all and hence no foul play on anyone's part. The defense counsel could not make an informed decision concerning whether to rely solely on the theory that the deceased committed suicide until he had considered information related to whether Ms. Newby may have died from gradual accumulation resulting from her regular dosage.

If a thorough investigation had been conducted as to the possible causes of Ms. Newby's toxicity, counsel might have concluded that a "gradual accumulation" defense would not have been profitable. In that case, the decision to rely upon suicide as the defense theory would be reasonable. However, if an investigation would have revealed evidence that Ms. Newby may not have overdosed at all, then the failure to investigate the cause of the toxicity may be ineffective assistance of counsel.

Here, the trial court's findings do not fairly reach the issue asserted by post-conviction counsel. The motion court erred because the court examined only whether counsel's decision not to present expert testimony was reasonable *in light of the defense theory that the decedent committed suicide.* Defendant contends, however, that trial defense counsel's decision was unreasonable from an overall defense standpoint because counsel failed to investigate the cause of Ms. Newby's toxicity. The defense has never contended in its post-conviction motion that experts should have been consulted or used to support the defense theory that the deceased committed suicide. As if realizing its analysis was somewhat askew, the motion court proceeded to add that counsel "thoroughly investigated the victim's medical condition and cause of death." This statement, we conclude, is clearly erroneous. The record before us shows superficiality in counsel's alleged investigative efforts. As previously noted, counsel did not attempt to discuss Ms. Newby's condition with her personal physician, nor did he arrange for any physician or toxicologist to review her medical records. Nor did he seek to discuss Ms. Newby's case with the pathologist who conducted the autopsy. There is no indication he did any reading or research. He stated that he spoke with an unnamed cardiolo-

**260**

gist, and some cardiac nurses. We know nothing about the nature or content of those discussions, except that no attention was given to Ms. Newby's particular medical history and medical records. The case will be remanded for a finding as to whether counsel's decisions with regard to investigation were reasonable from an overall defense standpoint. The trial court must enter sufficient findings of fact and conclusions of law to fully enable this court to make a meaningful review of the judgment. *Lindsay v. State,* 790 S.W.2d 521, 522 (Mo.App.1990). It is appropriate to remand to the trial court where the trial court fails to make findings as to all matters raised in the post-conviction motion. *Id.; see also Moore v. State,* 827 S.W.2d 213, 216–217 (Mo. banc 1992) (Holstein, J., dissenting). Since the case is being remanded, the court may also re-evaluate evidence (and receive additional evidence if necessary) concerning whether defense counsel thoroughly investigated the facts "relevant to plausible options," such as challenging the alleged mechanism of the toxicity. *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066. If the court on remand believes the investigation was not thorough, then the court should determine whether it was reasonable professional judgment for counsel to limit his investigation into the cause of Ms. Newby's toxicity in view of the overall defense of the case. *Id.* The court may, if it deems it necessary, receive additional expert testimony. If the court finds counsel was ineffective, the court must then evaluate whether there is a reasonable probability that the fact finder would have reached a different result absent any such errors of counsel.[7] *Stepter,* 794 S.W.2d at 656.

### Conclusion

The judgment is affirmed as to the points raised on the direct appeal. As to the review of the judgment on the post-convic-

tion motion, the case is remanded for additional findings as set forth herein.

All concur.

**7.** Often, the issue of prejudice can be considered even before the issue of ineffectiveness. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069; *State v. Stepter,* 794 S.W.2d 649, 656 (Mo. banc 1990). Here, however, where proof that an overdose occurred was critical to the state's case, the prejudice is impossible to accurately evaluate

until a determination is made as to ineffectiveness. The motion court determined that there was no prejudice to defendant, but such determination is not sufficient where the analysis as to ineffectiveness proceeds along incorrect lines. *See Moore,* 827 S.W.2d at 215–216.