**STATE of Missouri, Respondent,**

v.

**Christine PISCIOTTA, Appellant.**

**No. WD 53898.**

Missouri Court of Appeals,
Western District.

Submitted Jan. 29, 1998.

Decided April 21, 1998.

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Ann R. Littell, Asst. Atty. Gen., Jefferson City, for respondent.

Before EDWIN H. SMITH, P.J., and SMART and ELLIS, JJ.

SMART, Judge.

Christine Pisciotta was convicted, after a jury trial, of murder in the second degree in violation of § 565.021, RSMo 1994[1] and armed criminal action in violation of § 571.015. She was sentenced to concurrent terms of fifteen years and five years, respectively. She appeals her conviction, contending that it was an abuse of discretion for the trial court to sustain the State's objection to the testimony of her expert witness concerning a report prepared by the prosecution's expert on the issue of whether Ms. Pisciotta suffered from "battered spouse syndrome." Ms. Pisciotta claims that her right to due process of law guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution was violated by the court's ruling because an expert can properly base an opinion upon evidence admitted in the case and can rely on other experts' reports. The judgment is affirmed.

On the morning of September 12, 1995, Christine Pisciotta shot and killed her husband, Sam Pisciotta. The evidence, considered in the light most favorable to the verdict, showed that she murdered her husband in an attempt to obtain the proceeds of an insurance policy on her husband's life.

Ms. Pisciotta claims that she shot her husband in self-defense. At trial, she presented evidence that she suffered from the condition known as "Battered woman Syndrome." Battered Woman Syndrome has not been recognized as a distinct psychiatric diagnosis in the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association. Instead, the term describes a cluster of symptoms associated with post-traumatic stress disorder. *See* *State v. Copeland,* 928 S.W.2d 828, 838 n. 2 (Mo. banc 1996). Symptoms may include

"obsessive behavior, depression, social isolation, deference to the spouse, confusion, low self-esteem, guilt, lack of independence in thought or action, denial of reality, and a feeling of an absence of control." *Id.* at 838.

Sam and Christine Pisciotta were married in June 1992. After they were married, Sam adopted Christine's daughter, Alexandria. Throughout the marriage Mr. Pisciotta held several jobs simultaneously. He worked as a fireman for the Kansas City Fire Department, for Funeral Directors Service, and as a driver of a produce truck. Ms. Pisciotta stayed at home to care for her daughter. Ms. Pisciotta also developed the habit of going to Harrah's Casino to play blackjack. She went to Harrah's at least twice a week. Delana Cangelosi, a blackjack dealer at Harrah's, characterized the defendant as a "regular customer" and estimated that she may have been losing up to $700.00 per week or more. In August 1995, the defendant met Daniel Naylor at Harrah's. She told Mr. Naylor that she was separated from her husband and that her husband abused her. Mr. Naylor and the defendant developed a friendship and talked to each other over the telephone every other day.

Mr. and Mrs. Pisciotta maintained a joint checking account. In the few months preceding the murder, there were several incidents of insufficient funds. Bank records indicated that the defendant wrote most of the checks on the account, while her husband deposited most of the checks. Bank records also showed that several withdrawals had been made from the account from automatic teller machines near Harrah's casino. On the night before he was killed, Mr. Pisciotta went to an ATM machine in an attempt to withdraw some money. When Mr. Pisciotta attempted to access the account, he learned that it had been closed. He told his friend that he didn't see how that could be because the day before he had put $500.00 into the account. Mr. Pisciotta was on duty that night and stayed at the fire station until 7:00 the following morning, the morning of the murder.

1. All statutory references are to Revised Statutes of Missouri 1994, unless otherwise indicated.

On the morning of September 12, 1995, the defendant called Mr. Naylor and told him that something had happened and that she needed to talk. Mr. Naylor agreed to meet with Ms. Pisciotta in the parking lot of a gas station. The defendant told Mr. Naylor that she and her husband had been arguing over their daughter and that she had shot him when he threatened her life. The defendant showed a .38 caliber revolver to Mr. Naylor and talked about getting rid of it. Mr. Naylor left. Later that day, he reported the incident to the police. The police found the body of the victim at about 5:00 p.m. in the kitchen of the couple's home. The house was tidy. The only sign of disarray was an overturned kitchen chair lying on the victim. The defendant had never telephoned 911 or attempted to get help for her husband. The evidence indicated Mr. Pisciotta had been shot from behind with a .38 caliber revolver.

Anthony Inzenga, the grandson of the Pisciotta's landlord, Rose Inzenga, was at his grandmother's house when the police arrived asking for directions to the Pisciotta apartment. Mr. Inzenga called Sam Pisciotta's father, Frank Pisciotta, to tell him that the police were going to Sam Pisciotta's apartment. Frank paged Ms. Pisciotta at about 5:30 p.m. The defendant told Frank that Sam was "out looking for a pickup truck." The defendant called Mr. Inzenga. She told him that she did not know what was going on at the apartment. At approximately 5:15 p.m., the defendant attempted to cash a check at a department store at a suburban mall. The store refused to cash her check because she had written insufficient funds checks to the store on earlier occasions. The defendant had her daughter with her at the time. An acquaintance of defendant saw her at the store. She testified that when she greeted the defendant, the defendant smiled and said "hi." She said defendant did not appear upset.

At approximately 7:00 p.m., defendant went to the police station. When the police informed her that she was a suspect, she started crying and insisted that she knew nothing. She stopped crying abruptly and asked to speak to her parents. The next day, September 14, 1995, the defendant was examined for evidence of any bruises, scars, scratches or similar injuries on her body. None were found.

About a week after the murder, Teresa Ann Pisciotta, the victim's mother, went to the couple's apartment to remove her son's things. She found a notebook belonging to defendant. She turned the notebook over to the police. Handwriting exemplars taken from defendant were compared with the writing in the notebook and the handwriting in the notebook was identified as defendant's handwriting. Various notations were made in the notebook, including the notations "Sammy sucks" and "Harrah's, call me Sammy Joe sucks." Ms. Pisciotta had done some arithmetic in the notebook. On one page she wrote, "Declare bankruptcy on Mastercard, Visa, Jones, Sears, Express." Also appearing were the words, "City Bank 3000, Credit Union 2000, for a total of 5000. Funeral expenses 5000, for a total of 10,000. Insurance 45,000 minus 10,000 equals 35,000." Near references to 35,000 the word "free" was written. The evidence showed that Sam Pisciotta had a $45,000.00 life insurance policy. His beneficiaries were his wife, Christine, and their daughter, Alexandria. In her testimony at trial, defendant attempted to explain the notations in the notebook as part of a discussion that she and her husband had about the amount of life insurance that they needed.

At trial, defendant testified that she was abused throughout her marriage and that she was acting in self-defense when she shot her husband. Prior to trial, Christine was evaluated by four psychologists and psychiatrists to determine whether she suffered from battered spouse syndrome. Three of these experts, including two appointed by the trial court, opined that Ms. Pisciotta was indeed suffering from battered spouse syndrome. The expert retained by the prosecution, Dr. John H. Wisner, M.D., disagreed, finding that Ms. Pisciotta did not suffer from the syndrome.

The defense called Dr. Marilyn Hutchison, a psychologist specializing in victimology, to testify that Ms. Pisciotta did suffer from battered spouse syndrome. During the direct examination, Dr. Hutchison was asked

about Dr. Wisner's report. The following exchange occurred:

Q. Okay. Now, since then, after that review of records, have you seen an additional report from a Dr. Wisner?

A. I have.

Q. Okay. And have you had a chance to look at his report and view it?

A. I have.

(Counsel approached the bench and the following proceedings were had:)

MS. WERNER: I am going to object to her commenting on another expert's testimony. She has affirmative evidence to present and that's fine, but for her to comment on the conclusions of another expert, I mean, I object to that. And she really didn't complete the record until after she had Dr. Wisner's report.

* * *

THE COURT: There is nothing improper about her saying that she reviewed a report and reviewed some records, but she will not be allowed to comment or criticize essentially the report of another expert. I don't think you were intending to do that.

MR. LANCE: Well, yes, actually, we were. I think it's proper. I don't have any case law at hand, but I was going to ask her just as I asked, do you think of the findings Missouri Western is consistent and what conclusions you drew from that. I thought the reason we were ordered to turn in our reports is so that opposing sides could review the reports.

MS. MOORE: I think it's improper.

THE COURT: Well, I think she can certainly comment on the fact, you know, she reviewed his records, what his report said, but I don't think that their opinions and the fact that opinions differ, but she is not going to be able to directly criticize his report.

MR. LANCE: Could I make an offer of proof? We were going to ask the questions, have you ever reviewed this report? I reached a different conclusion. How would you respond to that? And I think—

THE COURT: Those first questions I would allow to ask. Now, I might even allow you to ask that depending on what you're getting into.

MR. LANCE: I think her answer would go on these lines. Similar to this. I found his report confusing because he seemed to identify many things related to battered wife syndrome but he reached a conclusion she did not have it without any explanation as to why.

MS. WERNER: Judge, I think it's going to be obvious that she disagrees with Dr. Wisner, and that's a matter for the jury to decide who is right and who is wrong in terms of battered spouse syndrome. It's not proper for an expert to comment on another expert's report. She can give her reasons for her conclusion.

MS. MOORE: It's just like one witness commenting on the credibility of another witness.

THE COURT: Are you making an offer of proof?

MR. LANCE: Yes, with that question and answer.

THE COURT: Like I said, those earlier questions I would allow, but the court will deny that that earlier portion and the objection is sustained.

The jury found defendant guilty of murder in the second degree and armed criminal action. She was sentenced to concurrent terms of fifteen years and five years respectively. Ms. Pisciotta appeals.

In her sole point, defendant argues that her right to due process as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, §§ 10 and 18(a) of the Missouri Constitution was violated. Defendant contends that the trial court erred by not allowing Dr. Hutchinson to testify why she believed that Dr. Wisner's conclusions were incorrect. Ms. Pisciotta claims that defense counsel made an offer of proof that he intended to ask why Dr. Hutchinson found Dr. Wisner's report confusing and why Dr. Wisner's conclusion was incorrect. However, Ms. Pisciotta's statement of the offer of proof is not

accurate. Counsel's actual remarks were as follows: "Could I make an offer of proof? We were going to ask the questions, have you ever reviewed this report? I reached a different conclusion. How would you respond to that?" He also said, "I think her answer would go on these lines. Similar to this. I found his report confusing because he seemed to identify many things related to battered wife syndrome but he reached a conclusion she did not have it without any explanation as to why."

▮ The reason for making an offer of proof is to insure that the trial court and opposing counsel can understand what evidence is being offered and the relevance of that evidence to the case. *State v. Townsend*, 737 S.W.2d 191, 192 (Mo. banc 1987). Furthermore, an offer of proof is necessary to preserve the matter for appellate review where the objection to the proffered evidence has been sustained by the trial court. *State v. Schneider*, 736 S.W.2d 392, 401 (Mo. banc 1987). In order for an appellate court to judge whether or not the evidence should have been admitted, the court must first know exactly what evidence was excluded. To this end, it is said that an offer "should be specific and in sufficient detail to demonstrate its admissibility; mere conclusions of counsel will not suffice." *Townsend*, 737 S.W.2d at 192.

▮ The proper form of an offer of proof occurs when counsel puts the witness on the stand, outside the presence of the jury, and elicits testimony by the questioning of that witness. *Id.* Another method courts often allow is one in which counsel makes a narrative offer of proof, summarizing the proposed testimony. *Id.* A narrative offer must be definite and specific. It must be more than merely conclusions by counsel. *State v. L R*, 896 S.W.2d 505, 509 (Mo.App. 1995). Counsel relying on the narrative form runs the risk of the reviewing court finding that the offer is not sufficient. *Townsend*, 737 S.W.2d at 192.

▮ Here, we need not address either the issue of preservation or the evidentiary issue itself, because the State concedes that the trial court should have allowed Dr. Hutchison to discuss Dr. Wisner's report. With the State conceding error, but arguing the error was harmless, the only issue for review is whether the error was harmless. The exclusion of relevant and admissible evidence is not always regarded as reversible error. *State v. Ray*, 945 S.W.2d 462, 469 (Mo.App. 1997). In a criminal case, error is presumed to be prejudicial. *State v. Ford*, 639 S.W.2d 573, 575 (Mo. banc 1982). It will be considered prejudicial unless the reviewing court can declare beyond a reasonable doubt that it was not prejudicial to the fairness of defendant's trial. *State v. Miller*, 650 S.W.2d 619, 621 (Mo. banc 1983) (*citing Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

▮ A criminal defendant is constitutionally guaranteed a right to a meaningful opportunity to present a complete defense. *Ray*, 945 S.W.2d at 469 (*citing Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)). In some cases it is possible that due process might be denied where a defendant is denied the opportunity to present "relevant and competent evidence negating an essential element of the state's case...." *State v. Copeland*, 928 S.W.2d 828, 837 (Mo. banc 1996). Evidence of battered spouse syndrome is admissible in Missouri on the issue of self-defense. Section 563.033.1, RSMo 1994 provides: "Evidence that the actor was suffering from the battered spouse syndrome shall be admissible upon the issue of whether the actor lawfully acted in self-defense or defense of another." Such evidence is admissible because it explains what might otherwise be inexplicable—why a woman perceives the necessity of using lethal force in a situation where it seems a "reasonable person" would have chosen to leave the abusive relationship. *See State v. Williams*, 787 S.W.2d 308, 312–13 (Mo.App.1990). However, the statute does not make the syndrome a defense. Rather, evidence of the syndrome is offered to show a battered spouse's state of mind at the time of the offense in order to assist the jury in evaluating the claim of self-defense. Defendant testified that she was afraid that Sam would kill her, and that at the time in question he hit her in the head with the telephone, and then "he tossed—he backed me up against the refrigerator and he had his hands around my neck...." She then de-

scribed a violent struggle for the gun. She claimed that her husband had the gun at one point and he laid it down. At one point in her testimony, she said he was coming at her at the time she shot him. At another point, she said he was backing away from her. In attempting to describe how the bullet apparently entered his head from the right rear, near the ear, she said that when she discharged the weapon, he turned to the side. The expert testimony presented in rebuttal indicated that, in order for Mr. Pisciotta to turn fast enough after hearing the shot, Mr. Pisciotta's reaction time would have had to be quicker than .005 of a second. Expert testimony showed that Mr. Pisciotta's reaction time, in such a scenario, would be unheard of, since olympic athletes, reacting to a starter pistol, generally can do no better than .25 of a second.

No physical evidence supported her story. Ms. Pisciotta was found to be unmarked. Although she claimed she kneed her husband in the groin, there was no evidence of any injury to him other than the fatal injury. The crime scene was tidy. The location of the body, relatively close to the door, was consistent with the possibility that Mr. Pisciotta was trying to leave, and was shot from behind. Also, other circumstances undermined her claim of self-defense. Ms. Pisciotta did not summon emergency help after the incident. She did not contact anyone after the incident, other than her friend, Mr. Naylor. She informed Mr. Naylor only that she had shot Mr. Pisciotta after an argument and that Mr. Pisciotta had threatened to kill her. She lied to her husband's father, stating she knew nothing about why the police were involved. Later that day she was seen at the shopping mall with her daughter, acting normally. When contacted by the police, she initially denied knowledge of the incident.

Other evidence also made the "battered spouse" issue seem quite marginal. Defendant's notations in her notebook suggested that she was thinking about how she could gain financially by her husband's death. The evidence also showed that she was gambling away a considerable amount of money and that she had not informed her husband as to the extent of her losses.

The narrative offer of proof made by the defense showed only that Dr. Hutchinson would have testified that she found Dr. Wisner's report confusing because he seemed to identify many things related to battered wife syndrome but then reached the conclusion she did not have the syndrome without explaining why he reached that conclusion. Such testimony from Dr. Hutchinson could hardly be regarded as necessary to defendant's case. The jury already knew that Dr. Hutchinson disagreed with Dr. Wisner's conclusions. Also, since Dr. Wisner was subject to cross-examination himself, there was nothing which would have kept counsel from cross-examining Dr. Wisner about the alleged paradoxical absence in the report of supporting reasons for his conclusion. Moreover, whether defendant met the profile of a "battered spouse" was not in itself material to her guilt or innocence. The evidence shows overwhelmingly that, regardless of whether defendant was a battered spouse, she did not act in self-defense in killing her husband. For all the foregoing reasons, it is clear beyond any reasonable doubt that the trial court's refusal to allow Dr. Hutchinson to criticize Dr. Wisner's report did not in any way deprive defendant of a fair trial. The judgment of the trial court is affirmed.

EDWIN H. SMITH, P.J., and ELLIS, J., concur.