**Reva Elaine FRANCIS, Appellant,**

v.

**STATE of Missouri, Respondent.**

**No. WD 63589.**

Missouri Court of Appeals,
Western District.

Dec. 27, 2005.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 31, 2006.

As Modified Jan. 31, 2006.

Application for Transfer Denied
Feb. 28, 2006.

Kent E. Gipson, Kansas City, MO, for appellant.

Don Willoh, Kansas City, MO, for respondent.

Before NEWTON, P.J., LOWENSTEIN and BRECKENRIDGE, JJ.

PATRICIA BRECKENRIDGE, Judge.

Reva Francis appeals the denial of her Rule 29.15 post-conviction motion, following her conviction for second degree murder, 565.021, RSMo 2000, and armed criminal action, 571.015, RSMo 2000, in the death of her husband, Anthony Francis.[1] On appeal, Ms. Francis claims the motion court erred in denying her motion for post-conviction relief because she was not provided effective assistance of counsel. Specifically, Ms. Francis claims that trial counsel's failure to investigate and present expert testimony that Ms. Francis suffered from battered spouse syndrome at the time of the shooting denied her effective assistance of counsel. Additionally, Ms. Francis claims that she was denied effective assistance of counsel because her trial counsel promised the jury during opening statements that she would testify, but then rested her case without presenting her testimony. This court finds that the decision not to present the defense of battered spouse syndrome in favor of an accident defense was a reasonable decision based on trial strategy. Additionally, because of the unexpectedly limited nature of the State's case-in-chief, the decision to rest Ms. Francis' case without her testifying, as consented to by Ms. Francis, was reasonable trial strategy. The judgment of the motion court is affirmed.

**Factual and Procedural Background[2]**

In August 1998, Reva Francis was living with her husband, Tony, and her 18-year-old daughter, Roxanne Cummings, at their

---

1. All statutory references are to the Revised Statutes of Missouri 2000.

2. Portions of this section are taken, without further attribution, from this court's prior opinion in *State v. Francis,* 60 S.W.3d 662 (Mo.App.2001).

home near Raymore in Cass County. On the afternoon of August 18, Roxanne's boyfriend, Shane Ross, came to the house, planning to take Roxanne on a date. Shane and Roxanne were in Roxanne's bedroom talking and listening to the radio when Tony Francis came home at around 4 P.M. Roxanne briefly stepped out of the bedroom to greet her stepfather.

A short time later, Roxanne and Shane heard "something hit the wall," followed by a short pause and then a noise that "[s]ounded like a firecracker." After the first "pop," Roxanne said she heard her stepfather yell and then a very short time later another "pop." Roxanne estimated a couple of seconds passed between shots. Shane said he heard a shot, screaming, and then another shot. Upon hearing the shots, Shane and Roxanne went into the kitchen. They observed Tony Francis slumped over a chair.

Officer Tony Yates was the first to arrive at the scene of the shooting. After entering the house, Officer Yates saw Ms. Francis "standing inside the kitchen living room area." She appeared distraught, was shaking, and was standing about two and a half to three feet from the body of Tony Francis, which was slumped over a chair. There was a small pool of blood around the victim's head. Ms. Francis did not appear to have any blood on her body or clothing. Ms. Francis approached Officer Yates and told him "it was an accident [that] she accidentally shot her husband." The officer inquired where the gun was. Ms. Francis pointed to the floor. Officer Yates observed a .32–caliber semi-automatic handgun lying near a purse.

There was a hole in the side of the purse. Subsequent forensic tests showed that the muzzle of the gun was in contact with the wall of the purse at the time it was fired. Investigators also found a spent shell casing inside the appellant's purse and a second spent shell casing in a flowerpot near the kitchen sink. A checkbook was lying near Tony's head.

Officer Yates asked where the gun was when it went off, and Ms. Francis stated it was in her purse. She explained to him that "the gun went off in her purse through a struggle." Ms. Francis stated that she fired two shots: "there was one shot, some more arguing, then a second shot." Officer Yates testified that he believed Ms. Francis had indicated that there had been "[a] few seconds maybe" between the two shots, but he "really c[ould]n't recall" for certain.

Officer Dale Loney arrived at the scene shortly after Officer Yates. He advised Ms. Francis of her rights and she agreed to waive her rights and make a statement. Ms. Francis told Officer Loney "that she and her husband had been involved in an argument and that there was a struggle over her purse and there was a gun inside of her purse and that the gun went off." She further told Officer Loney that she and her husband were sitting at the kitchen table at the time the first shot was fired. According to Officer Loney, Ms. Francis stated: "There was a struggle over her purse, that he attempted to get her purse from her and that the weapon was in the purse and it went off accidentally." Officer Loney asked Ms. Francis on two separate occasions whether she had intentionally shot Tony. Both times she stated she did not. Officer Loney asked Ms. Francis if the argument had become physical. Ms. Francis said that it had not. Ms. Francis further stated that her husband had only become physical with her on one occasion—shortly after the couple was married. Officer Loney asked again whether there had been an altercation. Ms. Francis reasserted that she and her husband had had a verbal argument.

Ms. Francis was taken into custody. She was interrogated by Detective Denise Davidson and Captain Charles Stocking that evening for approximately six hours at the Cass County sheriff's office. Most of the interrogation was videotaped. After again waiving her rights, Ms. Francis made the following statement:

I came home around four p.m. Sunday night. We're s[i]tting ... at the dining room table going over bills and [our] checkbook.... He called the secretary to go over bills and I explained to him that I didn't like the gun in the house and I was taking it to Anita's or Lanna's house. He got mad and tried to get the gun out of my purse and my hand was in there, too. Then, the gun went off. I stand up with the gun in my left hand and with the purse in my right hand. Tony fell over the table and onto the chair. The gun went off one more time in my hand. I dropped the gun and my purse and fell to the ground. I yelled at Shane to call the police.

At one point during the questioning, the police officers asked Ms. Francis to show them how the second shot had been fired. An officer testified that Ms. Francis told them that, "Tony fell over the chair. She had the gun in this hand, her hand on the right of the purse. She said, leave me the f—k alone, pointed the gun down and then did this motion [demonstrating] with her hand, indicating the gun went off another time." Detective Davidson testified that when Ms. Francis demonstrated how the gun discharged the second time, it appeared that "when [Ms. Francis] extended her arm out, she made a grasping motion with her hand, as if to fire the gun again." At one point during her interview with Captain Stocking, the subject of abuse was raised. Ms. Francis denied that her husband had abused her.

The autopsy revealed that Tony suffered gunshot wounds to the back of the head, left shoulder and chest, caused by two bullets. Gunpowder particles were on the victim's shirt where one bullet hit him in the chest. The bullet hit him above and to the outside of the left nipple, moving in a slightly downward direction from left to right, front to back. The bullet penetrated the left lung, the heart, and then the right lung before lodging under the skin. A separate bullet entered the back of the head, exited, and ended up in Tony' right shoulder. The cause of death was listed as "multiple gun shot wounds." The ballistics test showed that the .32–caliber semi-automatic handgun found at the scene had fired the fatal bullets. The gun had a trigger pull of fifteen pounds, which is considered a "heavy trigger pull." The gun had to be "cycled" after inserting the magazine for a round to be fired. A loosely-held automatic pistol is unlikely to fire a second time and is likely to jam. The weapon used to shoot Tony had two safety mechanisms: a magazine safety, which prevented the trigger from being pulled if the magazine was removed; and a button on the left side of the handgun that had to be turned to the "off" position before the gun would fire.

Ms. Francis was indicted for first degree murder, under section 565.020.1, RSMo 2000, for knowingly and deliberately killing her husband. Ms. Francis was also indicted for armed criminal action, under section 571.015. Ms. Francis hired Randell Wood, Brian Gepford, and Willard Bunch to defend her against the State's charges. John Cash, another attorney, was consulted on a more limited basis. Mr. Wood, who was lead counsel, had tried four murder cases prior to Ms. Francis' case. Mr. Gepford had tried criminal cases for his entire career, which began around 1982. A very large number of these cases were murder cases. Mr. Bunch had practiced law for

thirty-five years. Most of his experience is in criminal law, including between 50 and 100 murder trials.

Prior to trial, trial counsel became aware that Ms. Francis had been abused by her husband in the past. There were records from two interventions by the police. Specifically, in September 1988, Ms. Francis reported to police that Tony had physically assaulted her. Ms. Francis told police that Tony broke her nose during this assault. In August 1989, after Ms. Francis had attempted to leave him, Tony broke into the home where Ms. Francis was staying, tied her up, and forcibly took her to their shared residence, where Tony continued to abuse her until police arrived. Between the August 1989 incident and the day of the shooting, there were no documented incidents in which Tony physically abused Ms. Francis. Nevertheless, the parties to this post-conviction case have stipulated that the evidence of abuse was sufficient such that Ms. Francis could have presented a defense of battered spouse syndrome.

At a pre-trial hearing on March 24, 2000, the State filed a motion in limine to preclude trial counsel from asserting inconsistent theories of defense. Specifically, the State sought to prevent trial counsel from presenting concurrent defenses of self-defense and accident. The State argued that this was inconsistent under Missouri law because a defense of accident requires an unintentional act, while a defense of self-defense requires an intentional act. Mr. Gepford noted that Ms. Francis might present a defense in which "the circumstances surrounding the first shot may be different from the circumstances surrounding the second shot." The trial court responded that while the circumstances may vary between the first shot and the second shot, trial counsel would have to choose one defense for the cause of death. The trial court told trial counsel that they could not initially present an accident defense to the jury and then, later, attempt to present a defense of self-defense.

Based on the trial court's pretrial ruling, and Ms. Francis' statements that the shooting was accidental, trial counsel decided to proceed with a primary defense of accident. The decision to proceed with a defense of accident was unanimous among Ms. Francis' trial counsel. Because trial counsel did not plan to submit a legal defense of battered spouse syndrome, trial counsel did not provide statutory notice as required under section 563.033.2.[3] Nevertheless, trial counsel planned to introduce evidence that Ms. Francis had been abused by her husband. On March 30, 2000, at the direction of Mr. Wood and Mr. Bunch, Dr. William Logan, a psychiatrist, examined Ms. Francis.[4] Trial counsel intended to use Dr. Logan's report at the sentencing phase, if Ms. Francis was convicted.

On April 3, 2000, the trial began. Immediately following the State's opening statement, Mr. Wood gave an opening statement on Ms. Francis' behalf. In his opening statement, Mr. Wood stated repeatedly that Ms. Francis would testify and explain her version of the events surrounding the shooting. Mr. Wood further stated that the jury would hear that Ms. Francis had been abused by her husband and that Ms. Francis was the only person alive who could testify to what had happened the day of the shooting. At trial,

---

**3.** Under section 563.033.2: "If the defendant proposes to offer evidence of the battered spouse syndrome, he shall file written notice thereof with the court in advance of trial."

**4.** Dr. Logan examined Ms. Francis again on April 21, 2000, and, with Roxanne, on May 4, 2000.

the State was prepared to call thirty-two witnesses to assist in its case against Ms. Francis. Through pre-trial discovery, trial counsel was aware that some of those witnesses would testify that Ms. Francis threatened to kill her husband, wanted to kill her husband or planned to kill her husband, prior to the day of the shooting, evidence relevant to whether Ms. Francis had killed her husband deliberately. The State, however, rested after calling only ten witnesses[5] and presenting a segment of Ms. Francis' videotaped police interview, which lasted between thirty seconds and two minutes. The State chose not to present the evidence that Ms. Francis had stated that she wanted to kill her husband.

█ The State's failure to offer this evidence created a dilemma for trial counsel. If trial counsel put on a defense, the State, on rebuttal, could introduce the evidence that Ms. Francis expressed a desire to kill her husband prior to the day of the shooting.[6] On the other hand, trial counsel had told the jury during opening statements that Ms. Francis would testify. Trial counsel asked for a recess until the next morning. That night, trial counsel, Ms. Francis, and her family discussed the matter for several hours. Mr. Gepford expressed the opinion that Ms. Francis should testify, even in light of the State's decision to rest without introducing all of its incriminating evidence of deliberation. Mr. Wood, however, believed the better strategy was to have Ms. Francis rest her case without presenting a defense. Mr. Bunch made Ms. Francis aware of her right to testify. After hearing the advantages and disadvantages of both strategies,

Ms. Francis ultimately decided not to testify.

Ms. Francis went before the court the next day and stated, in open court, that she understood her rights and had decided not to testify in her own defense. Ms. Francis made clear that it was her decision to forego her right to testify in her own defense, stating: "I've discussed it with my lawyers and my family and my daughter and I'm the only one that came to the conclusion last night." The trial judge then asked Ms. Francis if she was making her decision with knowledge "that the Jury might draw some adverse inference from" the fact that Mr. Wood had told the jury during opening statements that she would testify. Ms. Francis stated that she understood that risk. Consequently, Ms. Francis rested without presenting evidence.

The parties made their closing arguments and the case was submitted to the jury. The jury was instructed on charges of first degree murder, and the lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter. It was also instructed on the additional charge of armed criminal action. The jury found Ms. Francis guilty of second degree murder and armed criminal action. The jury recommended a sentence of twenty-three years in prison for second degree murder and five years in prison for armed criminal action. Ms. Francis filed a motion for judgment of acquittal, or in the alternative, for new trial, which the trial court denied. Ms. Francis also filed a motion for reduction of sentence, in which she introduced Dr. Logan's findings that she suffered from bat-

5. This number includes the videotaped deposition of Jenny Smith, trace evidence examiner for the Missouri Highway Patrol.

6. Ms. Francis' statements would have been admissible under the admission exception to

the hearsay rule because the statements are "relevant to material issues of intent and deliberation." *State v. Davis*, 877 S.W.2d 669, 677 (Mo.App.1994). *See also State v. Kelley*, 953 S.W.2d 73, 83 n.4 (Mo.App.1997).

tered spouse syndrome and major depressive disorder, of moderate severity. At the sentencing hearing, the trial judge indicated that he had read the motion, but thought the information would have been more relevant if Ms. Francis had pleaded guilty. He denied the motion and imposed a sentence of consecutive prison terms of twenty-three years and five years, as recommended by the jury.

Ms. Francis appealed the trial court's decision regarding sentencing, claiming the trial court failed to properly consider the information regarding battered spouse syndrome and major depressive disorder. Ms. Francis also appealed her conviction on other grounds. This court determined that it was unclear whether the trial court considered Ms. Francis' motion and the evidence of battered spouse syndrome and major depressive disorder because the trial judge indicated he believed such considerations "could be appropriately considered only when the defendant had either pleaded guilty or had elected to waive the jury." *Francis*, 60 S.W.3d at 670. This court reversed on that point and ordered a new sentencing hearing. *Id.* This court affirmed the trial court's decision in all other respects. *Id.* at 675–76.

At the new sentencing hearing, the trial court re-sentenced Ms. Francis to a sentence identical to its original sentence. Thereafter, Ms. Francis filed a Motion to Vacate, Set Aside, or Correct the Judgment or Sentence, pursuant to Rule 29.15. This motion was subsequently amended. In her motion, Ms. Francis claimed that her trial counsel had provided ineffective assistance because:

(i) [Ms. Francis] did not testify and was improperly advised not to testify and was, therefore, prevented from presenting evidence of Battered Spouse Syndrome in that she claimed that:

(ii) The victim verbally and physically abused [Ms. Francis] on several occasions, all of which would bear on the state of mind of [Ms. Francis].

(iii) The jury never heard the above evidence and a claim of self-defense was never presented.

(iv) [Ms. Francis] desired to testify and was prohibited from testifying concerning Battered Spouse Syndrome and self-defense and was deprived of her defense.

(v) In closing argument, counsel for [Ms. Francis] opened the door to the State's comment on [Ms. Francis'] failure to testify, calling attention to the fact which led the jury to believe that [Ms. Francis] was in fact hiding something by not testifying.

(vi) In opening statement, counsel stated that [Ms. Francis] would in fact testify and gave a character history of [Ms. Francis] being a victim of both physical and mental abuse by the deceased.

(vii) Trial counsel failed to present as a witness, Dr. William S. Logan, M.D., who treated and counseled [Ms. Francis] for psychiatric issues specifically related to his findings pursuant to DSM 4 Section 309.81 of Post Traumatic Stress Disorder (Battered Woman Syndrome) at the trial of this matter and at sentencing. Attorney Bunch testified that with regard to the psychiatric evaluation being ordered, it wouldn't have cost anybody a penny to have done it anyway because Bill Logan would have done it at his request and they would have paid him when they had the money.

At the hearing on the 29.15 motion, Mr. Wood testified that he had investigated the battered spouse defense, obtaining medical

and police records and interviewing and endorsing witnesses to support the claim that Ms. Francis had been abused. Mr. Wood also testified that he could have obtained a report from Dr. Logan, prior to trial, supporting a defense of battered spouse syndrome. After the hearing, the motion court found, *inter alia*, that the decisions to proceed with an accident defense and to rest Ms. Francis' case without having Ms. Francis testify were matters of reasonable trial strategy and denied Ms. Francis' motion. Ms. Francis appeals.

## Standard of Review

██ This court reviews the denial of a Rule 29.15 motion to determine whether the motion court's findings of fact and conclusions of law are clearly erroneous. *State v. Baldridge*, 857 S.W.2d 243, 256 (Mo.App.1993). Determinations of the motion court will be held to be clearly erroneous only if, after reviewing the entire record, this court has a definite and firm impression that the motion court is mistaken. *Id.* To establish ineffective assistance of counsel, Ms. Francis "must satisfy the *Strickland* two-prong test, showing (1) counsel failed to exercise the customary skill and diligence that a reasonably competent attorney would exercise under substantially similar circumstances, and (2) that [she] was thereby prejudiced." *Baldridge*, 857 S.W.2d at 256 (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). The attorney's conduct must be so egregious that the adversarial process has broken down to a point that the trial court's decision cannot be relied on as producing a just result. *Clayton v. State*, 63 S.W.3d 201, 206 (Mo. banc 2001). Counsel is presumed competent and the movant must

overcome a "heavy burden" by proving counsel was ineffective by a preponderance of the evidence. *Baldridge*, 857 S.W.2d at 256 (citing *Amrine v. State*, 785 S.W.2d 531, 534 (Mo. banc 1990)).

## No Error in Failing to Present Dr. Logan's Testimony

In her first point on appeal, Ms. Francis asserts that she was denied effective assistance of counsel because her trial counsel failed "to investigate and present testimony from Dr. William Logan" that she suffered from battered spouse syndrome and post-traumatic stress disorder.[7] Ms. Francis claims that Dr. Logan's testimony "would have provided a viable defense to the murder charge by establishing that the second shot was fired in self-defense and by bolstering the believability of [Ms. Francis'] statement to police that the first shot was accidental in the course of a struggle over the handgun in her purse."

██ In her Rule 29.15 motion, Ms. Francis claims that her trial counsel was ineffective because it did not *present* Dr. Logan's testimony that she suffered from battered spouse syndrome. Unlike her appellate brief, Ms. Francis' Rule 29.15 motion does not assert that trial counsel was ineffective for failing to *investigate* that defense. This omission may have reflected the fact that the evidence demonstrates that Ms. Francis' trial counsel investigated the possibility of a battered spouse defense. Mr. Wood testified that he investigated the possibility of a battered spouse defense, obtaining police and medical records and interviewing and endorsing witnesses. Mr. Wood believed he could obtain expert testimony supporting such a defense prior to trial and that the evidence was sufficient that he could ob-

**7.** According to Dr. Logan's report, post-traumatic stress syndrome and battered spouse syndrome form the same affliction.

tain a jury instruction for a battered spouse defense. Mr. Wood ultimately decided not to pursue such a defense after comparing the relative merits of an accident defense and a battered spouse defense. Thus, Mr. Wood's decision to pursue a defense of accident was not made out of ignorance of the existence of a battered spouse defense, but was based on an assessment of which defense would produce the best result.

■ Regardless of the reason for the omission, "[c]laims which were not presented to the motion court cannot be raised for the first time on appeal." *Amrine*, 785 S.W.2d at 535. Ms. Francis cannot now claim that her trial counsel was ineffective for failing to *investigate* whether Dr. Logan's testimony would have supported a battered spouse defense. Similarly, while Ms. Francis now contends, on appeal, that Dr. Logan's testimony could have supported a hybrid defense of both accident and self-defense, Ms. Francis did not make this claim in her Rule 29.15 motion or at the hearing on the motion. Consequently, this court's review is limited to whether the motion court clearly erred in finding that trial counsel's failure to *present* Dr. Logan's testimony on battered spouse syndrome did not constitute ineffective assistance of counsel.

■ To establish ineffective assistance of counsel, Ms. Francis must demonstrate that her trial counsel's assistance did not meet an "objective standard of reasonableness." *Middleton v. State*, 103 S.W.3d 726, 732 (Mo. banc 2003) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2052). Decisions of trial strategy, that were reasonable at the time they were

made, cannot form the basis of a claim of ineffective assistance of counsel even if, in hindsight, better choices could have been made. *Cole v. State*, 152 S.W.3d 267, 270 (Mo. banc 2004). *See also Knese v. State*, 85 S.W.3d 628, 633 (Mo. banc 2002). In the specific context of a claim of ineffective assistance of counsel for failure to call a witness to testify, Ms. Francis must demonstrate "that the 'decision involved something other than reasonable trial strategy; that the witness could have been located through reasonable investigation; that the witness would have testified; and that the witness' testimony would have provided the defendant with a viable defense.' " *Perkey v. State*, 68 S.W.3d 547, 549 (Mo. App.2001) (quotation omitted). Thus, the first question that must be addressed is whether trial counsels' decision to proceed with a defense of accident rather than battered spouse syndrome was reasonable trial strategy.

■ As noted above, four lawyers represented Ms. Francis. Trial counsel believed Ms. Francis had been physically and emotionally abused by her husband and that they could have made a case for a battered spouse syndrome defense sufficient to get an instruction from the court on the defense. Nevertheless, trial counsel testified that there were other viable defenses, including accident. At pre-trial hearings, the trial court ruled that trial counsel would have to choose a defense and could not maintain inconsistent defenses; either trial counsel could present a defense of battered spouse syndrome or trial counsel could present a defense of accident.[8]

---

8. The correctness of the trial court's ruling on this issue was not appealed. The failure to appeal the decision was not included as part of Ms. Francis' Rule 29.15 motion and cannot now be reviewed. There are circumstances under which inconsistent defenses of accident and self-defense may be raised, i.e., when evidence of an alternative defense is introduced by the State or a third party. *See e.g.,*

Faced with a choice between accident and battered spouse syndrome, and considering Ms. Francis' repeated statements to police officers that the shooting was accidental, trial counsel unanimously chose to present a defense of accident. Consequently, trial counsel did not certify a defense of battered spouse syndrome as required by section 552.063.[9] Rather, trial counsel chose to pursue a defense of accident, while intending to introduce evidence that Ms. Francis had been abused. This decision forms the primary basis of Ms. Francis' claim of ineffective assistance of counsel.

■■■■ Ms. Francis claims trial counsel was ineffective because it did not present Dr. Logan's testimony. Because this court reviews trial counsel's effectiveness in the light of the circumstances of the case, *Sidebottom v. State*, 781 S.W.2d 791, 795 (Mo.1989), the statements Ms. Francis made to police are critical. This court's review of Ms. Francis' claim is hampered, however, by the fact that neither Ms. Francis' videotaped police interview, nor the transcript thereof, has been included in the record on appeal.[10] The absence of this information is important because it forms some of the most powerful evidence against Ms. Francis and strongly influenced trial counsel's decision to proceed with a defense of accident. Nevertheless, even without this information, it is clear that a defense relying exclusively on battered spouse syndrome would have been problematic. "[E]vidence of the battered spouse syndrome is not in and of itself a defense to a murder charge...." *State v. Edwards*, 60 S.W.3d 602, 613 (Mo.App. 2001). Rather, battered spouse syndrome augments a claim of self-defense. *Id.*

■■■■ To establish a valid clam of self-defense to a charge of murder, a defendant must prove:

(1) absence of aggression or provocation on the defender's part; (2) real or apparent necessity for the defender to kill to save herself from an immediate danger of serious bodily injury or death; (3) reasonable cause for the defender's belief in such necessity; and (4) an attempt by the defender to do all within her power consistent with her personal safety to avoid the danger and the need to take a life.

*State v. Avery*, 120 S.W.3d 196, 200–01 (Mo. banc 2003). Under section 563.033, a defendant may use evidence of battered spouse syndrome to support the third element of self-defense, a reasonable belief that deadly force was required to protect the defendant from serious harm at the hands of the victim. *State v. Pisciotta*, 968 S.W.2d 185, 189 (Mo.App.1998). The remaining three elements must be proven independently of any evidence of battered spouse syndrome. *Id.*

■■ A claim of self-defense, supported by battered spouse syndrome, however, requires an intentional act. *Cf. State v. Miller*, 981 S.W.2d 623, 632 (Mo.App.1998). A claim of accident requires an unintentional act. *Id.* Both prior to her arrest and shortly thereafter, Ms. Francis made statements to the police that both shots were accidental. Ms. Francis told Sergeant Dale Loney, Officer Tony Yates, and Detective Denise Davidson, on the day of the incident, that both shots had been accidental. Ms. Francis reaffirmed her claim of accident in both her videotaped

---

*State v. Avery*, 120 S.W.3d 196, 201–02 (Mo. banc 2003).

**9.** The evidence supports the motion court's finding that trial counsel was aware that it

had to endorse battered spouse syndrome as a defense, but chose not to do so.

**10.** Most of the six-hour interview was videotaped.

police statement and in her written police statement. Thus, because of the trial court's pre-trial ruling, had trial counsel pursued a battered spouse defense, Ms. Francis would have been forced to either repudiate her statements that the shooting was an accident and somehow explain her repeated statements to the contrary, or offer evidence that, while Ms. Francis believed the shooting was accidental, the shooting was actually intentional. Either tactic could have substantially undermined Ms. Francis' credibility, weakening her defense.

Trial counsel believed that, rather than risk this adverse reaction, they should proceed with the defense Ms. Francis' statements most supported—the defense of accident. Ms. Francis participated in discussions with her attorneys concerning the alternative defenses and the decision to proceed with the accident defense came out of these discussions. Accordingly, trial counsel did not provide the notice required by section 563.033(2) for presenting evidence of battered spouse syndrome. This decision prevented trial counsel from introducing Dr. Logan's testimony regarding Ms. Francis being a battered spouse.[11] Nevertheless, trial counsel planned to introduce evidence that Ms. Francis was abused. Such evidence could have been introduced through Ms. Francis' testimony or from the testimony of other witnesses, such as Ms. Francis' daughter, and used to establish the circumstances surrounding the shooting. Once the trial started, however, Dr. Logan's testimony regarding whether Ms. Francis suffered from battered spouse syndrome could not be introduced because trial counsel made a strategic decision to proceed with the alternative defense of accident.

■■■ Provided the decision is reasonable, a deliberate and informed choice to pursue one defense over another is a matter of trial strategy that cannot form the basis of a claim of ineffective assistance of counsel. *Henderson v. State*, 111 S.W.3d 537, 540 (Mo.App.2003). Whether trial counsel had decided to present a defense of accident or a defense of self-defense, supported by battered spouse syndrome, trial counsel's decision would likely have been deemed reasonable trial strategy. Neither defense manages to fully account for the circumstances of the shooting or the discrepancy between Ms. Francis' repeated statements that the shooting was accidental and her demonstration of the second shot. Here, trial counsel was aware that it was required to present a defense of battered spouse syndrome or a defense of accident. Ms. Francis' statements that the shooting was accidental, her denial that the argument had become physical, her failure to claim that she had acted out of self-defense, and her denial that Tony had been abusive (except one time early in the marriage) made a defense of battered spouse syndrome problematic. Because of the difficulty of Ms. Francis' repeated statements that the shooting was accidental, trial counsels' decision to proceed with a defense of accident, while planning to introduce evidence that Ms. Francis was abused by her husband, was a reasonable trial strategy and cannot form the basis of a claim of ineffective assistance of counsel. *Worthington v. State*, 166 S.W.3d 566, 573 (Mo. banc 2005).

Trial counsel did not, however, introduce evidence that Ms. Francis had been abused by the victim. From pretrial discovery, trial counsel knew the State had witnesses who would testify that, prior to the night of the murder, Ms. Francis had

---

**11.** Section 563.033.2 states: "If the defendant proposes to offer evidence of the battered spouse syndrome, he shall file written notice thereof with the court in advance of trial."

stated that she wanted to or planned to kill her husband. To the surprise of trial counsel, the State rested without introducing this evidence. Through cross-examination of the State's witnesses, trial counsel had demonstrated that Ms. Francis had consistently asserted the shooting was accidental. Yet, trial counsel had not presented evidence of abuse. Trial counsel had planned to bring this evidence in through their defense witnesses. After weighing the advantages of presenting a defense and introducing evidence of abuse, against the disadvantages of permitting the State to bring its rebuttal case, which included the testimony that Ms. Francis expressed a desire to kill her husband prior to the day of the shooting, trial counsel decided to rest their case. Nevertheless, Ms. Francis' first claim is that trial counsel was ineffective for failing to present Dr. Logan's testimony. Ms. Francis does not claim trial counsel was ineffective for failing to introduce evidence that Ms. Francis was abused from any source other than Dr. Logan. Consequently, with regard to Ms. Francis' first claim of error, trial counsel's decision not to present evidence of abuse from witnesses other than Dr. Logan is not challenged.

 Under the circumstances, trial counsel's decision to proceed with a defense of accident, to the exclusion of Dr. Logan's testimony, was not unreasonable. At worst, trial counsel selected the less effective of two reasonable strategies. Nevertheless, a reasonable trial strategy is not ineffective assistance, even if, in hindsight, it was not the best strategy available. *Id.* at 573. Ms. Francis has not met the first hurdle of proving that her trial counsel was ineffective for failing to present a witness because she has not demonstrated the decision not to present Dr. Logan's testimony was unreasonable. *Perkey,* 68 S.W.3d at 549. Here, trial counsel presented a defense consistent with Ms. Francis' explanation of events. As such, the adversarial process has not been so undermined as to indicate that the result reached by the trial court cannot be relied on as just. *Clayton,* 63 S.W.3d at 206. Ms. Francis' first point is denied.

### Resting Case Without Having Ms. Francis Testify Not Ineffective Assistance

In her second point, Ms. Francis asserts that her trial counsel was ineffective because trial counsel told the jury that she would testify and then rested its case without calling her to provide the promised testimony. Mr. Wood told the jury, during opening statements, that Ms. Francis would testify in her own defense. Additionally, Mr. Wood told the jury that Ms. Francis would testify that her husband abused her and explain how she accidentally shot her husband. Ms. Francis claims that these promises during opening statement, coupled with resting her case without having her testify, amount to ineffective assistance of counsel and entitle her to a new trial.

 As with the previous claim, this court reviews the motion court's decision for clear error. *Baldridge,* 857 S.W.2d at 256. Trial counsel is not ineffective if the error complained of was reasonable trial strategy. *Worthington,* 166 S.W.3d at 573. Whether to testify is a "fundamental decision that a defendant has a right to make." *State v. Holcomb,* 956 S.W.2d 286, 296 (Mo.App.1997). Trial counsel's advice as to whether a defendant should testify is usually a matter of trial strategy. *Id.* Consequently, "[a]bsent exceptional circumstances, it is not grounds for post-conviction relief." *Id.*

Here, the record shows that Ms. Francis participated in the decision to forego testifying. At trial, Ms. Francis was examined

by both the trial court and her own attorney, on the record, regarding her decision not to testify. Ms. Francis was questioned about the magnitude of her decision and whether it was entirely voluntary. Ms. Francis testified that she understood the magnitude of her decision and that it was voluntary. Ms. Francis was further asked if she understood, in making her decision not to testify, that the jury could "draw some adverse inference" from the fact that trial counsel had promised the jury that Ms. Francis would testify during openings statements. Ms. Francis responded that she understood that risk. Consequently, the dispositive question is whether trial counsel's opening statements, coupled with trial counsel's advice that Ms. Francis not testify, constitute exceptional circumstances that make trial counsel's performance ineffective.

Missouri courts have not specifically addressed the issue of whether trial counsel is ineffective when counsel advises a client not to testify after stating to the jury in opening statements that the defendant will testify. Missouri courts have addressed a similar situation in which the jury was told in opening statements that it would hear specific testimony and then trial counsel rested without presenting that testimony. *See Blankenship v. State*, 23 S.W.3d 848, 850–51 (Mo.App.2000). Trial counsel's performance in that case, however, was extremely poor. *Id.* The trial court determined that it was because of a lack of preparation, rather than a choice of strategy, that trial counsel decided not to present the testimony promised during opening statements. *Id.*

Ms. Francis argues that her trial counsel's performance was similarly inadequate. In *Blankenship*, however, "[t]he trial judge was uneasy about counsel's lack of preparation, and characterized his conduct at the trial as 'fumbling, stumbling

and bumbling.'" *Id.* at 850. Here, the motion court found trial counsel's performance to be competent. The motion court also found that trial counsel's decisions were based on reasonable trial strategy. In support of her position, Ms. Francis relies on statements made by Mr. Bunch and Mr. Gepford, indicating that the defense team was disorganized and that Mr. Wood abandoned his plans out of fear rather than sound strategy. Mr. Wood's testimony contradicts those statements. On a claim of ineffective assistance of counsel, "the motion court is free to believe or disbelieve any evidence, whether contradicted or undisputed, including the movant's testimony, and [this court] defer[s] to the motion court on matters of credibility." *Krider v. State*, 44 S.W.3d 850, 858 (Mo.App.2001). Ms. Francis' characterization of trial counsel's performance does not give the necessary deference to the motion court's judgment. In light of the motion court's judgment, trial counsel's performance was not incompetent so as to bring this case within the ambit of *Blankenship*.

Other jurisdictions have addressed the situation in which it was the defendant's testimony that was promised to the jury. In *Ouber v. Guarino*, 293 F.3d 19, 27 (1st Cir.2002), trial counsel made an "initial decision to present [defendant's] testimony as the centerpiece of the defense." Trial counsel made this clear to the jury in opening statements. *Id.* Nevertheless, trial counsel subsequently advised the defendant not to testify. *Id.* The court found that trial counsel's opening statements, in conjunction with his decision to advise his client not to testify, was ineffective assistance "in the absence of unforeseeable events forcing a change in strategy." *Id.* In *People v. Briones*, 352 Ill.App.3d 913, 287 Ill.Dec. 909, 816 N.E.2d 1120, 1125 (2004), trial counsel told the jury that the

defendant would testify, but then changed her strategy and did not have the defendant testify. The court found that trial counsel was unable to show either that the defendant had decided not to testify or that, "because of unexpected events, sound trial strategy required her to break her promise that the defendant would testify." *Id.* Because trial counsel could show neither of these events had occurred, the court found trial counsel's performance "was deficient." *Id.* In *United States v. Leibach,* 347 F.3d 219, 257 (7th Cir.2003), trial counsel told the jury, during opening statements, that the defendant would testify and that information would be presented that the defendant was not in a gang. Trial counsel, however, presented neither the defendant's testimony, nor testimony that the defendant was not in a gang. *Id.* The court found that, because no "unforeseeable events" had influenced trial counsel's decision, trial counsel was ineffective. *Id.*

*State v. Zimmerman,* 823 S.W.2d 220, 226 (Tenn.Crim.App.1991) is a case closely similar to the case at bar. In *Zimmerman,* trial counsel promised the jury during opening statements, that defendant, a psychiatrist, and others would testify that defendant was a battered wife who killed in self-defense. *Id.* Trial counsel, however, advised the defendant not to testify and did not present this evidence. *Id.* The court found trial counsel ineffective because there was no "sudden change" in the case that would have justified changing trial strategy. *Id.*

As these cases make clear, the question whether trial counsel has provided ineffective assistance, in this type of situation, turns on whether an unexpected and unforeseeable event has occurred that justifies altering trial strategy. *See Guarino,* 293 F.3d at 27; *Briones,* 287 Ill.Dec. 909, 816 N.E.2d at 1125; *Zimmerman,* 823

S.W.2d at 226. Here, the testimony at the motion court hearing provides sufficient evidence upon which the motion court could have found trial counsel was surprised by the State's decision to rest. At the motion hearing, Mr. Wood testified that he was surprised by the State's decision to rest its case without putting on evidence that Ms. Francis had expressed, prior to the day of the shooting, that she wanted to see her husband dead. Specifically, Mr. Wood stated: "We likely fell out of our chair when [the State] closed." This led Mr. Wood to advise Ms. Francis that she should not testify in her own defense despite trial counsel's promises to the contrary during opening statements. Trial counsel discussed the advantages and disadvantages of testifying with Ms. Francis and her family for several hours. Mr. Wood advised Ms. Francis that she should not testify. Mr. Gepford, however, was adamant that Ms. Francis testify. It is unclear what advice Mr. Bunch gave Ms. Francis other than informing her that it was her right to testify in her own defense. After hours of discussion, Ms. Francis made the final decision that she would not testify.

The question is whether the State's decision to rest its case-in-chief without offering Ms. Francis' statements that she wanted to see her husband dead was truly unforeseeable. Ms. Francis argues that this was not unforeseeable, in that trial counsel knew the substance of the prosecution's witnesses in advance of trial. Further, Ms. Francis argues trial counsel was aware that the prosecutor in this case liked to hold back substantial evidence for rebuttal. Ms. Francis suggests, therefore, that trial counsel cannot use the State's decision to close its case as an excuse for trial counsel changing its strategy, because it was not unforeseeable.

The fact that trial counsel knew the prosecutor had a predilection for holding witnesses back for rebuttal does not make the State's decision foreseeable. Ms. Francis has not indicated that trial counsel had any reason to know which witnesses might be held back. She argues, instead, that trial counsel should have reserved the defense's opening statement until after the State's evidence. Mr. Wood and Mr. Gepford testified that there is a risk that the jury will make up its mind, based on opening statements, and defense attorneys do not think it is wise to reserve making opening statement until the end of the State's evidence. Further, trial counsel was not ineffective in failing to predict that the State would choose to hold back evidence that Ms. Francis stated she wanted to kill her husband, since that was crucial evidence to the State's charge that Ms. Francis deliberated before killing her husband. The record supports the finding that the State's decision to rest when it did was unexpected and unforeseeable.

Once the State rested, trial counsel faced a difficult decision: either trial counsel could present Ms. Francis' testimony and evidence of abuse, or it could decline to present evidence and stand on the defense of accident presented through cross-examination. There were advantages to both strategies. By presenting a defense, trial counsel could introduce the testimony of Ms. Francis as promised. Ms. Francis would be able to testify as to her husband's abuse. The jury might find Ms. Francis a more sympathetic defendant after having heard this evidence. Moreover, Ms. Francis' own, more expanded testimony as to how the shooting had occurred might have helped the jury to accept that Ms. Francis had accidentally shot her husband twice. Presenting a defense would also have allowed trial counsel to introduce other witnesses, such as Roxanne, to testify as to Tony's abuse.

While these advantages might have influenced the jury, there were disadvantages to presenting a defense as well. Indeed, some of the disadvantages of presenting a defense could well have undermined or cancelled out the possible advantages. By calling Ms. Francis to testify, trial counsel would allow the State to introduce evidence of Ms. Francis' statements that she wanted to kill her husband. These statements were damaging for two reasons. First, the statements substantially undermined Ms. Francis' defense. The statements indicate that the shooting was not accidental, as the statements demonstrate that Ms. Francis wanted her husband dead prior to the day of the shooting. Mr. Wood testified at the motion hearing that he considered Ms. Francis' statements to be "dangerous." Indeed, Ms. Francis would have been faced with a difficult cross-examination when she was forced to explain her statements about wanting to kill her husband, coupled with her insistence that she accidentally shot her husband.

Second, Ms. Francis' statements provide strong evidence in favor of deliberation, a necessary element of first degree murder. *See State v. Dorsey*, 156 S.W.3d 791, 798–99 (Mo.App.2005). While deliberation is "cool reflection for any length of time *no matter how brief* [,]" evidence that Ms. Francis had contemplated her husband's death prior to the day of the shooting would have been very strong evidence of deliberation. Section 565.002(3) (emphasis added). Thus, by preventing the State from introducing Ms. Francis' statements, trial counsel substantially reduced the chances that Ms. Francis would be convicted of first degree murder. Indeed, this strategy worked. Ms. Francis was convicted of the lesser charge of second degree murder.

The difference between first degree murder and second degree murder is very significant. The minimum sentence for first degree murder is life in prison, without the possibility of parole. The minimum sentence for second degree murder, on the other hand, is a sentence of not less than ten and not more than thirty years or life in prison. Thus, trial counsel's strategy reduced Ms. Francis' charge to second degree murder where the minimum sentence was ten years in prison. This strategy further allowed trial counsel to introduce Dr. Logan's report in the sentencing hearing to attempt to reduce Ms. Francis' sentence.

When the State rested its case, trial counsel had to balance the damage the statements would cause against the potential damage caused by not calling Ms. Francis to testify after telling the jury she would testify. There were advantages and disadvantages to calling Ms. Francis to the stand. Mr. Wood testified that the decision was difficult and that the discussion went on long into the night. Ultimately, Mr. Wood advised Ms. Francis she should not testify. Ms. Francis decided to accept Mr. Wood's advice. While the jury disbelieved Ms. Francis' claim that the shooting was accidental, it did not convict Ms. Francis of first degree murder as the State had urged. Rather, the jury found Ms. Francis guilty of second degree murder and recommended a sentence of twenty-three years in prison. Ms. Francis' conviction of second degree murder, as opposed to first degree murder, may be largely attributable to the fact that the jury never heard evidence that Ms. Francis wanted to kill her husband prior to the day of the shooting.

Had Ms. Francis testified at trial and permitted the State to introduce its rebuttal case and the evidence of Ms. Francis' previous statements that she wanted to kill her husband, it is quite possible that Ms. Francis would have been convicted of first degree murder and sentenced to life in prison. Ultimately, trial counsel was faced with an unexpected development that justified suggesting a change in strategy. Ms. Francis made the final decision as to this change in strategy after testifying that she understood the implications of her decision. Ms. Francis was subsequently convicted of a lesser offense than the offense she was charged with. Under such circumstances, trial counsel was not ineffective. Ms. Francis' second point is denied.

The judgment of the motion court is affirmed.

All concur.